**UNITED STATES of America, Plaintiff,**

v.

**HOLLYWOOD MARINE, INC. and Water Quality Insurance Syndicate, in personam and T/B Wasson No. L, in rem., Defendants.**

Civ. A. No. H–77–1870.

United States District Court,
S. D. Texas,
Houston Division.

July 31, 1981.

Carl Walker, Jr., U. S. Atty. (Jack Shepherd, Asst. U. S. Atty.), Houston, Tex., Rosemary A. Denson, Trial Atty., Torts Branch Civil Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Brown, Sims & Ayre, Ronald L. White, Houston, Tex., for defendants.

## MEMORANDUM AND OPINION

HANNAY, Senior District Judge.

During and after the trial of this case, it became apparent that it would be significantly controlled by the final ruling in the case of *United States v. LeBeouf Brothers Towing Co.*, later decided (July 18, 1980) under that name by the Fifth Circuit, 621 F.2d 787, rehearing denied, 629 F.2d 1350, with application for writ of certiorari thereafter addressed to the United States Supreme Court. That application has now been denied, 450 U.S. ——, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). This Court's opinion and ruling herein now follows:

This is a suit brought against Hollywood Marine, Inc., hereafter Hollywood, to recover costs expended to clean up oil which was spilled from the tanker barge Wasson I, hereafter Wasson, into the Intracoastal Waterway at Mile 536 between Rockport and the Sun Pipeline Dock in the Corpus Christi Ship Channel on or about December 22, 1975. The Wasson, which was bareboat chartered by defendant Hollywood at the time of the accident, was one of two barges in the tow of the towboat M/V Bayou La-Fourche, which was proceeding westbound on the Intracoastal Waterway, when the oil was discharged.

When the oil was spilled, the defendant Hollywood failed to clean up the oil. Nor did it provide for the oil to be cleaned up. Consequently, the Coast Guard employed the services of a commercial contractor and incurred cleanup expenses totalling $16,-477.42. Although the Coast Guard, pursuant to 33 U.S.C. 1321 of the Federal Water Pollution Control Act, hereafter F.W.P.C.A., 33 U.S.C. § 1251 *et seq.*, made demand upon the defendant as owner *pro hac vice* of the Wasson for payment of the cleanup expenses and the $2,500.00 penalty assessed against the company, such payment was not forthcoming. The United States thereupon filed this suit to collect the cleanup costs and the penalty.

### Findings of Fact

By January of 1975 and at all times material herein Hollywood was engaged in the business of transporting petroleum cargo by barge in the coastal and inland waters of Texas, including those within the Southern District of Texas, through the use of two boats owned and/or operated by other com-

panies. By December 12, 1975 Hollywood became the owner *pro hac vice* of the Wasson, with all the responsibilities of an owner. This maritime status obtained at the time of this accident. The Wasson was an unpropelled tank barge of 1,634 gross tons with United States documentation.

The Wasson had insurance coverage by the Water Quality Insurance Syndicate, hereafter, W.Q.I.S. for liability arising under the FWPCA, as required by 33 U.S.C. § 1321(p), in the amount of $163,400.00 which amount equalled $100/gross ton of the vessel.

On December 22, 1975, the date of the accident, the WQIS was a company engaged in writing water pollution insurance coverage for liability arising under the FWPCA's Section 1321. It was so at all times material herein.

By January of 1975 and thereafter as is herein material Big B. Towboat Services, Inc., hereafter Big B, was engaged in the business of general towage in the coastal and inland waters of Texas. On December 22, 1975 Big B was the owner and operator of the M/V Bayou LaFourche and had the sole responsibility for manning, victualing and supplying it. On that date the Bayou LaFourche was a United States documented, steel hulled, diesel driven, twin prop, 1,400 horse-powered towboat built in 1972, with a registered gross tonnage of 138 tons. By January of 1975 and thereafter as is material here Bayou LaFourche, Inc., was managing agent for Big B and was in charge of booking, scheduling and dispatching towboats owned and/or operated by Big B, including the Bayou LaForche. Hollywood Marine Terminals, Inc. was a subsidiary of Hollywood Marine, Inc.

On January 3, 1975 Hollywood Terminals, on behalf of Hollywood, entered into a Boat Charter Agreement with Bayou LaFourche, Inc., which was acting on behalf of Big B. Pursuant to the terms and conditions of this contract, which was in effect on the date of the accident herein, Big B was to provide the Bayou LaFourche for the purpose of performing towing services for Hollywood's barges. The contract proved in pertinent parts as follows:

*Warranty:*

The vessel to be furnished by Owner, controlled and/or managed by Owner is warranted by Owner to be in all respects seaworthy, properly manned, equipped and supplied and to be so maintained at all times by Owner. Owner shall furnish all necessary towing hawsers, bridles and coupling lines, cross over lines and gear to safely operate and handle and barge or barges comprising the tow to be furnished by Charterer.

*INDEMNITY:*

While engaged in operating under this charter agreement, Owner will handle Charter's barges or barge for Charterer's account but will act solely as an independent contractor and will have exclusive control in every particular of the method and manner of performing towing operations and will indemnify Charterer against all claims of third parties, other than those excepted herein, for damages caused by the towage operations. Owner agrees to comply with all navigation laws and regulations with respect to tug and tow and to indemnify and hold charterer harmless from any claims, demands or losses arising out of the violation of any laws or regulations, either State or Federal.

*FULLY FOUND CHARTER:*

Owner shall use due diligence to furnish skillful and qualified master and crew sufficient to navigate said vessel and carryout Charterer's assignments promptly and with good seamanship, and said master and crew shall be furnished at Owner's own cost and expense. Owner shall also victual and supply said vessel fully found to Charterer. This agreement shall not be constructed as a demise of the vessel.

On the date of the accident the Wasson, as part of the tow of the Bayou LaFourche, was proceeding westbound on the Intracoastal Waterway, a navigable water of the United States, from Baytown, Texas towards Corpus Christi, Texas in the area of Mile 536, at the time it grounded. As a

result of the grounding and holing of one of its tanks, the vessel spilled oil into the water. The Wasson discharged in excess of 8000 gallons of oil into the Intracoastal Waterway and this created a sheen on the water.

As previously mentioned Hollywood failed to clean up the oil and the United States Coast Guard had to have it done.

The proof discloses that the actual cost for the cleanup of the oil totaled $16,477.42, which includes $13,123.26 paid to the Corpus Christi Oil Spill Association, and $3,354.16 for Coast Guard personnel salaries and Coast Guard material and equipment costs or lease costs used in the cleanup.

A civil penalty of $2,500.00 was assessed against Hollywood by the Coast Guard pursuant to 33 U.S.C. § 1321(b)(6) which Hollywood Marine refused to pay.

### CONCLUSIONS OF LAW

Venue and jurisdiction are proper in this case pursuant to 28 U.S.C. § 1345 and the Federal Water Pollution Control Act (FWPCA) as amended, 33 U.S.C. § 1251 *et seq.* (1972) and in particular Section 1321(n). The United States in its sovereign capacity and according to the legislative direction of Congress, maintains, protects and preserves as public property the navigable waters of the United States, among which includes the Intracoastal Waterway.

■ The United States' cause of action in this case to recover the cost of removal of oil from the navigable waters of the United States is governed by the FWPCA, as it existed prior to the Amendments of December 27, 1977. Under the FWPCA a vessel discharging oil in violation of 1321(b)(3) is liable, together with its owners, without fault, for the actual cleanup costs incurred by the United States.

There are four statutory defenses to such liability which are specified in 1321(f)(1). The defendants alleged these defenses to varying degrees in their answers but failed to carry their burden of exonerating themselves by proving any of them.

Their primary defense is 1321(f)(1)(D), in their claim that the discharge was caused solely by a "third party". This would be the Bayou LaFourche, which pursuant to Hollywood's Boat Charterer Agreement with Bayou LaFourche, Inc., was pushtowing the Wasson on the day that it grounded.

■ This same defense in a similar case was addressed by the Fifth Circuit in the aforementioned case of *United States v. LeBeouf Brothers Towing Co.*, 621 F.2d 787, rehearing denied, 629 F.2d 1350 (5th Cir. 1980) cert. denied —— U.S. ——, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). There, a barge which discharged oil claimed the spill was caused solely by a "third party"—a crewmember of the towboat that was in charge and control of the barge at the time of the discharge. In *LeBeouf* the court narrowly interpreted the term "third party" under 1321(f)(1), following the same reasoning as the First Circuit in *Burgess v. M/V Tamano*, 564 F.2d 964, 981–82 (1st Cir. 1977) cert. denied, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). The Fifth Circuit found that a towboat acting on behalf of a barge owner did not constitute a "third party" to the owner under Section 1321(f)(1). The Fifth Circuit, speaking through Circuit Judge Thornberry ruled that the third-party defense should be narrowly interpreted because the FWPCA's comprehensive scheme for preventing and cleaning up oil spills would be undermined if barge owners could escape liability merely by hiring out their operations to towboats and independent contractors. Therefore, a towboat pushtowing a barge would not be a "third party" to the barge owner or operator under 33 U.S.C. § 1321.

■ The quantity of oil that was spilled into the Intracoastal Waterway by the Wasson was clearly harmful within the meaning of 40 C.F.R. 110.3(b). It produced a film or sheen upon or a discoloration of the surface of the water and effected a significant pollution.

By reason of the discharge of the harmful quantity of oil into the navigable waters of the United States, the Wasson violated 33 U.S.C. § 1321(b)(3) which prohibits such a

discharge. Pursuant to 33 U.S.C. § 1321(p)(3), any claim by the United States for cleanup costs may be brought directly against the insurer, in this case WQIS. Evidence of financial responsibility is required by 33 U.S.C. § 1321(p)(1) and is provided here.

Because of the failure of the defendants Hollywood and WQIS to promptly remove the spilled oil from the water, the United States, pursuant to 33 U.S.C. § 1321(c)(1), properly caused the same to be removed from the water. Therefore, these defendants, including the Wasson, became and are liable, jointly and severally, to the United States pursuant to 33 U.S.C. § 1321(f)(1) and (p)(3) for the actual cost for removal of the oil. The total is $16,477.42. Looking to the intendment of the statute, as emphasized in the tenor of its construction in *United States v. LeBeouf Brothers Towing Co.*, supra, it is clear that liability obtains to the Coast Guard proper for its included expenses herein in the amount of $3,354.16. A question is suggested by Defendants as to the right of the United States to recover for its Coast Guard expenses herein. But the statute is plain and clear that the fault polluter is liable to the United States

"... notwithstanding any other provision of law, ..... for the actual costs incurred under .... this section for the removal of such oil or substance by the United States Government...." 33 U.S.C.A. § 1321(f)(1).

By reason of the discharge Hollywood also became liable for the payment of the $2,500.00 civil penalty which was assessed against it by the United States Coast Guard in accordance with 33 U.S.C. § 1321(b)(6). I hold that the civil penalty is valid and binding.

In accordance with the above findings and conclusions, judgment will be entered as follows:

In favor of plaintiff United States and against defendants Hollywood, Wasson and WQIS, jointly and severally in the amount of $16,477.42 together with costs and interest at the rate of 9% from the date the costs were incurred by the United States until time of payment.

In favor of the United States and against defendant Hollywood in the amount of $2,500.00 with interest at the rate of 9% from the date the penalty was assessed until time of payment.

Any finding of fact heretofore made which constitutes a conclusion of law is hereby adopted as such, and any conclusion of law which constitutes a finding of fact, is hereby adopted as such.

The Clerk will notify counsel.