**UNITED STATES of America; et al., Plaintiffs,**

v.

**A & F MATERIALS COMPANY, INC., et al., Defendants.**

Civ. No. 83–3123.

United States District Court,
S.D. Illinois.

Jan. 20, 1984.

John P. Lynch, Lawrence H. Levine, Mark A. Stegemoeller, Latham, Watkins, Hedlund, Hunter & Lynch, Chicago, Ill., John W. Leskera, Dunham, Boman & Leskera, East St. Louis, Ill., Burton M. Greenberg, London, Greenberg & Plegan, St. Louis, Mo., Max W. Hittle, Jr., Krieg, Devault, Alexander & Capehart, Indianapolis, Ind., S. Richard Heymann, Eric B. Rothenberg, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendants.

Robert Van Heuvelen, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., Bruce Reppert, Robert Simpkins, Asst. U.S. Attys., East St. Louis, Ill., Jane Schulteis, U.S. Environmental Protection Agency, Bob Mueller, Asst. Atty. Gen., State of Ill. Environmental Control Div., Chicago, Ill., for plaintiffs.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

Before the Court are numerous motions to dismiss attacking the government's amended complaint and the complaint in intervention. The government instituted this environmental action pursuant to § 311 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321, § 7003 of the Resource Conservation & Recovery Act (RCRA), 42 U.S.C. § 6973, and various provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, which is also known as Superfund. The State of Illinois intervened in this action and filed claims under the three federal statutes and the Illinois Environmental Protection Act, *Ill.Rev. Stat.*, ch. 111½, para. 1012(a). The motions before the Court can be summarized as follows:

1. Motion of generator defendants to strike all reference to joint and several liability from the complaint.

2. Motion of generator defendants to dismiss plaintiff's claim for mandatory injunctive relief.

3. Motion of generator defendants to dismiss plaintiff's claim for cost reimbursement under Superfund.

4. Motion of generator defendants to dismiss the complaint in intervention of the State of Illinois.

5. Motion of defendant CAM–OR to dismiss for failure to sue indispensible parties.

6. Motion of defendant Petrolite to dismiss for failure to state a claim.

### BACKGROUND

The subject of this dispute is a waste disposal site located on West Cumberland Street, Greenup, Illinois. The government alleges that from 1977 to 1980 over seven million gallons of wastes were deposited at the Greenup facility and placed into lagoons and tanks. The government alleges further that there have been releases and discharges of hazardous substances into the groundwater, adjacent fields, and into the nearby Embarras River. The authors of the present motions, Aluminum Company of America (Alcoa), Northern Petrochemical Company (NPC), CAM–OR, Inc., Petrolite Corporation and McDonnell-Douglas Corporation, herein referred to as the generator defendants, allegedly arranged for the disposal of their wastes at the Greenup site.

The resolution of the motions before the Court depends in part on the interpretation of three federal statutes. The Resource Conservation & Recovery Act, 42 U.S.C. §§ 6901–6987, is a regulatory statute authorizing the EPA to establish prospective standards for dealing with hazardous wastes. However, § 6973 of the Act gives the government authority to bring abatement actions to protect the environment. The government contends that under § 6973 it has stated a claim for mandatory injunctive relief.

The government's claim under § 311 of FWPCA, 33 U.S.C. § 1321, is also for injunctive relief. Section 311 contains an abatement provision similar to § 6973 of RCRA. However, under § 311 the actual or threatened discharge must be into navigable waters of the United States.

The government's third and most extensive federal claim is under CERCLA, 42 U.S.C. § 9601 *et seq.* CERCLA was enacted to provide a more comprehensive solution to the problem of hazardous waste sites. Section 9606 contains an abatement provision similar to those in RCRA and FWPCA. However, § 9604 and § 9607 establish a new approach to the hazardous waste problem. Section 9604 authorizes the government to clean up hazardous wastes by utilizing a 1.6 billion dollar fund, and § 9607 authorizes recoupment actions and defines who is liable for the costs of the cleanup.

CERCLA was enacted because Congress realized there were serious gaps in RCRA. H.R.Rep. No. 1016, 96th Cong. 2d Sess., pt. 1, 18, reprinted in 5 U.S.Code Cong. & Ad.News 6119, 6120 (1980); 126 Cong.Rec. H9459–60 (September 23, 1980). First, RCRA does not apply to the thousands of dormant sites that are not currently posing an imminent hazard. *United States v. Price*, 557 F.Supp. 1103 (D.N.J.1983). Secondly, Congress was concerned about the difficulty in locating financially responsible owners of hazardous waste sites. H.R.Rep. No. 1016 *supra*, at 22, *reprinted* in 5 U.S.Code Cong. & Ad.News at 6125 (1980). CERCLA authorizes the government to sue transporters and generators of hazardous waste. The establishment of the Superfund, which is funded primarily from taxes on the chemical industry, and the inclusion of generators in the liability provision of CERCLA, signals a clear legislative intent to impose on the chemical industry financial responsibility under that Act.

### I. JOINT AND SEVERAL LIABILITY UNDER CERCLA

CERCLA's liability provisions, 42 U.S.C. § 9607, unfortunately do little more than declare who is liable under the Act. The Act on its face does not address the diffi-

cult questions presented when there are dozens, even hundreds, of potentially liable parties. The characteristics of a typical waste disposal site and the characteristics of the waste disposal industry itself, make the issue of joint and several liability a critical one. Due to commingling and chemical reactions in tanks and lagoons, it will be very difficult if not impossible in some cases for the government to prove which generator is responsible for the leakage. The imposition of joint and several liability will in effect put the burden on defendants. Moreover, with joint and several liability, the government will be able to recover its entire costs, including costs actually caused by unknown or insolvent generators. *See* 126 Cong.Rec. H9463–65 (daily ed. September 23, 1980. Remarks of Representative Gore.)

### A. *Legislative History and Statutory Language*

CERCLA was enacted on December 11, 1980 in the last days of the 96th Congress. The final version of the Act was conceived by an ad hoc committee of Senators who fashioned a last minute compromise which enabled the Act to pass. As a result, the statute was hastily and inadequately drafted.[1] The only legislative history on the compromise is found in the floor debates. 126 Cong.Rec. S14,962–15,009 (daily ed. November 24, 1980); 126 Cong.Rec. H11,786–802 (daily ed. December 3, 1980). Originally both Houses of Congress introduced bills that provided for joint and several liability. H.R. 7020 and S. 1480. The compromise that was enacted, however, eliminated any reference to joint and several liability.

Defendants argue the elimination of the words joint and several from the Act conclusively establishes Congressional intent

not to impose joint and several liability. However, the floor debates on the compromise bill suggest that the deletion of joint and several language does not necessarily prevent imposition of a joint and several standard by the courts. Two Senators spoke to the issue on the floor of the Senate, Senator Randolph, one of the sponsors of the Act, and Senator Helms, an opponent of the Act who eventually voted against it. The positions taken by these Senators were inconsistent and irreconcilable. Senator Randolph said the issue of joint and several liability was "unresolved" and that courts should determine the liability of joint tort-feasors "under common or previous statutory law." 126 Cong.Rec. S14964 (daily ed. November 24, 1980). Senator Helms, on the other hand, stated that joint and several liability was precluded.

> It is very clear from the language of the Stafford-Randolph substitute itself, from the legislative history, and from the liability provisions of section 311 of the Federal Water Pollution Control Act, that now the Stafford-Randolph bill does not in and of itself create joint and several liability. The Government can sue a defendant under the bill only for those costs and damages that it can prove were caused by the defendant's conduct.

*Id.* at S15,004.

When the compromise bill went to the House, there was much more agreement as to what the deletion of the terms joint and several meant. Representative Florio and Representative Jeffords both stated that evolving principles of common law would determine the liability of joint tort-feasors. 126 Cong.Rec. H11787 and H11799. In addition, Representative Gore (H11,801) and Representative Mikulski (H11,796) stated

---

1. The attitude of the House of Representatives when confronted with the Senate compromise bill was aptly summarized by Representative Gibbons from Florida.

 "I am not happy with this bill, but I would be far sadder if we did not pass it. We must begin. We must start. We have been working on this problem for a year, and the problem gets worse every day, and we have only got 2 days left in this legislative session."

126 Cong.Rec. H11793 (daily ed. December 3, 1980).

Representative Harsha of Ohio complained that the final version was vague and internally inconsistent to such an extent that the "bill is not a superfund bill—it's a welfare and relief act for lawyers." 126 Cong.Rec. H11791 (daily ed. December 3, 1980).

that the compromise bill was essentially the same as the House bill which gave the Courts authority to impose joint and several liability under certain circumstances.

■ In light of the legislative history, the Court concludes that Congress did not intend to preclude the imposition of joint and several liability. First, Senator Helm's interpretation of the compromise stands alone, and his interpretation is suspect because he was an opponent of the bill. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976). *See United States of America v. Chem-Dyne Corp.*, 572 F.Supp. 802, 806 (S.D.Ohio 1983). Second, Senator Randolph's interpretation of the deletion of the terms joint and several does represent a significant compromise by the proponents of joint and several liability. Senators Stafford and Randolph gave up a mandatory legislative standard applicable to all cases in lieu of a case by case determination by the courts guided by common law principles. 126 Cong.Rec. S14964 (daily ed. November 24, 1980). Finally, there was an apparent consensus in the House that the compromise bill resolved the joint and several liability issue by relying on common law principles. No representative challenged Representative Florio's assertion that courts could impose joint and several liability.[2]

The Court's conclusion that the imposition of joint and several liability is not precluded by CERCLA is buttressed by Chief Judge Rubin's recent decision in *United States of America v. Chem-Dyne*, *supra*. Chief Judge Rubin reached the following conclusion on the issue of joint and several liability:

A reading of the entire legislative history in context reveals that the scope of liability and term joint and several liability were deleted to avoid a mandatory legislative standard applicable in all situations which might produce inequitable results in some cases. The deletion was not intended as a rejection of joint and several liability. Rather, the term was omitted in order to have the scope of liability determined under common law principles, where a court performing a case by case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis.

*Id.* at 808. (Citations omitted).

■ In addition to the legislative history, there exists express statutory language which supports the imposition of joint and several liability. Section 9601(32) of CERCLA states:

"liable" or "liability" under this title shall be construed to be the standard of liability which obtains under Section 311 of the Federal Water Pollution Control Act.

FWPCA says nothing specifically about joint and several liability, nonetheless, a number of courts have imposed joint and several liability by relying on common law rules of liability. *United States v. M/V Big Sam*, 681 F.2d 432, 439 (5th Cir.1982); *United States v. Hollywood Marine*, 519 F.Supp. 688, 692 (S.D.Tex.1981). *In the Matter of the Complaint of Berkley Curtis Bay*, 557 F.Supp. 335 (S.D.N.Y.1983). Defendants correctly point out that none of these cases are factually similar to this case. Indeed, a similar case would be too much to ask for because, as discussed below, generator liability is not available under FWPCA. Nonetheless, these cases do

2. Defendants argue that the Court should give little weight to the statements of Representative Florio and other members of the House because they had no part in drafting the final compromise. This argument is without merit because in order to vote intelligently the content of the Senate compromise had to be explained to the House. Representative Florio had this task, and he explained in effect that Senator Randolph's interpretation of the deletion of the term joint and several was the correct one. While many representatives expressed dissatisfaction with the Senate version due to the deletion of victim compensation and liability for oil spills from the House version, not one representative expressed concern that the liability provisions of the Senate version were weaker than those in the House version. Thus, the House passed the Senate version with the understanding that it did not preclude joint and several liability.

stand for the general proposition that courts will apply common law liability standards under FWPCA. Therefore, it is reasonable to conclude that by incorporating the liability provisions of § 311 of FWPCA into CERCLA, Congress intended the courts to impose common law liability rules on generators and other entities liable under CERCLA.

▪ Finally, the application of common law principles to CERCLA is supported by what the statute *does not* say. As stated above, CERCLA does no more than declare who is liable. Even all references to strict liability have been deleted, although defendants concede strict liability is the intended standard. This is not a case where Congress has passed detailed and comprehensive liability provisions which the government is attempting to supplement. CERCLA, on its face, gives no guidance on how to solve the problem of comingling, or whether liability should be apportioned based on the volume or toxicity of the waste, or how liability is to be apportioned between owners, operators, transporters and generators. CERCLA's silence in light of these extremely complex issues persuades the Court that Congress intended the courts to enforce CERCLA by applying evolving principles of common law on a case by case basis. Since joint and several liability is recognized in common law in the context of hazardous waste litigation, the imposition of joint and several liability is not precluded in this case.

### B. *The Scope of Liability Under CERCLA*

As stated above, the legislative history of CERCLA indicates Congressional intent to allow the courts to determine the scope of liability. 126 Cong.Rec.S. (daily ed. November 24, 1980). Indeed, Representative Florio indicated that rules of liability should be governed by federal common law. 126 Cong.Rec. H11787 (daily ed. December 3, 1980). Chief Judge Rubin in *United States v. Chem-Dyne, supra,* agreed with Representative Florio and held that "the ·delination of a uniform federal

rule of decision is consistent with the legislative history and policies of CERCLA ...." *Id.* at 809.

▪ The Court finds that there are compelling reasons for the development of a uniform federal common law in the area of hazardous waste. First, CERCLA and RCRA taken together represent a substantial special federal interest in the abatement of toxic waste hazards. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). Second, CERCLA is a liability creating statute which relies on the federal courts for implementation. The development of federal common law is appropriate to fill in the gaps of a federal statute. *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973). Third, a uniform rule of law will prevent excessive dumping in states with more lenient laws. Finally, the federal government has an interest in preserving the integrity of the Superfund and there is "no good reason why the United States' right to reimbursement should be subjected to the needless uncertainty and subsequent delay occasioned by diversified local disposition when this matter is appropriate for uniform national treatment." *United States v. Chem-Dyne, supra* at 809.

The content of the federal common law of liability under CERCLA is determined by two factors. The Court agrees with Chief Judge Rubin that the modern common law of liability for pollution cases is an excellent starting point. The modern trend is when two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he caused. Restatement (Second) of Torts, § 443(A) and § 881 (1976). The burden of proof as to apportionment is upon the defendant who seeks to limit his liability. *Id.* at § 433(B). Nonetheless, where two or more persons cause a single and indivisible harm,

each is subject to liability for the entire harm. *Id.* at § 875.

Second, while it is arguable that the final version of CERCLA gives the Court complete discretion to fashion rules of liability[3], the Court finds that the legislative history of CERCLA does contain evidence of Congressional intent as to the content of the federal common law of liability. After reviewing the legislative history, the Court concludes a rigid application of the Restatement approach to joint and several liability is inappropriate. Under the Restatement approach, any defendant who could not prove its contribution would be jointly and severally liable. This result must be avoided because both Houses of Congress were concerned about the issue of fairness, and joint and several liability is extremely harsh and unfair if it is imposed on a defendant who contributed only a small amount of waste to a site. The Senate expressed its sensitivity to the fairness issue by rejecting a mandatory legislative standard in lieu of allowing the courts to impose joint and several liability on a case by case basis.

Moreover, the House expressed its sensitivity to the fairness issue by passing a bill which contained a moderate approach to joint and several liability. On September 23, 1980, the House passed the Gore Amendment which softened the modern common law approach to joint and several liability, particularly when applied to a defendant who contributed a relatively small percentage to the waste site. 126 Cong. Rec. at H9461. The House was concerned that in many cases a small contributor would not be able to prove his contribution, and thus, would face joint and several liability for the whole injury. Under the Gore Amendment, a court had the *power* to impose joint and several liability whenever a defendant could not prove his contribution to an injury, however, a court could still apportion damages in this situation according to the following criteria:

(i) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved;

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*Id. See generally* Comment, *Generator Liability Under Superfund for Clean-up of Abandoned Hazardous Waste Dumpsites,* 130 U.Pa.L.Rev. 1229, 1269–1280 (1982).

■ The Court finds that the moderate approach to joint and several liability set out above is both persuasive and consistent with the intent of Congress. First, the Senate's failure to adopt the Gore Amendment cannot be interpreted as a rejection of its approach. Indeed, when Senator Randolph was discussing the significance of the deletion of the terms joint and several from the Senate version, he stated "the changes do not reflect a rejection of the standards in the earlier bill." 126 Cong.Rec. at S14964. Thus, the only thing the Senate rejected was mandatory legislative standard imposing joint and several liability.[4] Second, a number of representa-

---

**3.** Senator Randolph stated that issues of liability were unresolved by the Act, 126 Cong.Rec. at S14,964, and Representative Brown stated the Senate "avoided" the issue of liability. *Id.* at H11,801.

**4.** The Court's approach of looking to unpassed prior bills for the content of the federal common law is not novel. For instance, although Congress rejected Proposed Federal Rule of Evidence 503 on the attorney-client privilege in favor of a case by case analysis of the issue,

tives thought the final compromise bill implicitly incorporated the essence of the House's moderate approach to liability. 126 Cong.Rec. at H11,796 and H11,801 (Remarks of Representatives Mikulski, Gore, and Brown). Perhaps these representatives predicted that courts would be sensitive to the inherent unfairness of imposing joint and several liability on minor contributors. Finally, the moderate approach promotes fairness because it does not indiscriminately impose joint and several liability. Rather, it makes rational distinction based on such factors as the amount and toxicity of a particular defendant's contribution to a waste site.

## II. MANDATORY INJUNCTIVE RELIEF UNDER CERCLA, RCRA & FWPCA

 The government has sued the generator defendants for injunctive relief pursuant to § 9606(a) of CERCLA. The government contends this section gives the Court authority to order these defendants to clean up the Greenup site. Section 9606 provides:

> In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

The defendants contend that this language does not apply to inactive sites such as Greenup, and that it does not apply to off-site generators.

The Court finds that defendants' argument is without merit. The express language of § 9606 does not lend itself to the limitations suggested by defendants. Section 9606 is triggered when there is an "actual or threatened release of a hazardous substance from a facility." The term "release" includes waste that is leaking or escaping into the environment. 42 U.S.C. § 9601(22). It is irrelevant whether the release is from an active site or an inactive site such as Greenup. *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1113 (D.Minn.1982); *United States v. Price*, Civil No. 80–4104 (D.N.J., July 28, 1983) at 13–16.

Similarly, § 9606 contains no limitations on the classes of persons within its reach. Therefore, it is reasonable to conclude § 9606 is dependent on the liability provisions of § 9607, which include liability for generators under the Act. The Court is persuaded by the reasoning of Judge Brotman in *United States v. Price, supra:*

> The heading used for § 107 [§ 9607] "Liability" denotes an intention to have this section *define liability for the entire act.* This conclusion is reinforced by the fact that § 107 does not contain any qualifying language. Instead, it appears that Congress desired to use quite broad and unrestrained terminology. In this manner, § 107 sets forth standards of liability and associated defenses. Section 106(a) [§ 9606a] on the other hand, is quite vague and does not discuss any independent standards of liability with respect to those parties coming within its coverage. As such, it appears that § 106(a) is dependent upon the substantive provisions explaining liability outlined in § 107. (Emphasis added).

*Id.* at 17–18. Accordingly, the Court finds that past, off-site generators can be liable under Section 9606.

 Defendants argue the government's interpretation of the abatement provisions of § 9606 renders the 1.6 billion dollar fund and the recoupment provisions in § 9607 obsolete. This argument ignores the limitations within § 9606 and the complexities

---

courts have looked to the proposed rule as a source of defining the federal common law of

attorney-client privilege. *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1195 n. 6 (8th Cir.1981).

that are involved in the enforcement of CERCLA. Section 9606 contains two limitations in the otherwise expansive grant of equitable authority to federal courts. First, there must be an "imminent and substantial endangerment to the public health or welfare or to the environment." Second, the Court must be guided by the "equities of the case." Just because mandatory injunctive relief is possible under CERCLA does not mean it will be appropriate in a particular case. Mandatory injunctive relief is a harsh remedy that must not be granted lightly. Wright & Miller, *Federal Practice and Procedure:* Civil § 2942, at 377. A court must balance the interests of the parties while remaining cognizant of the practical problems surrounding an order. *Id.* at 367.

Moreover, even with the possibility of mandatory injunctive relief, there are numerous situations where the 1.6 billion dollar fund would have to be utilized. Congress estimated that there are 30,000 to 50,000 existing hazardous waste sites. House Report No. 96–1016, 5 U.S.Code & Cong.News 6119, 6120 (1980). Where there are dangerous "orphan" sites the government must utilize the Superfund without any hope of recoupment. Even where some liable parties can be located, when joint and several liability cannot be imposed the Superfund must absorb the costs associated with the liability of unknown and insolvent parties. Also in situations like the instant case, where preliminary injunctive relief is not available or impractical, Superfund must be utilized to stabilize a dump site. Finally, as stated above, the equities of the case may make mandatory injunctive relief inappropriate, thereby forcing the government to utilize Superfund to clean up the site and seek recoupment. Therefore, given the limited size of the Superfund and the complexities associated with cleaning up hazardous waste sites, it is reasonable to conclude that § 9606 was intended to work in tandem with § 9607 to clean up hazardous waste sites.

The conclusion that generators can be liable for mandatory injunctive relief under CERCLA does not lead to a similar result under RCRA or FWPCA. Indeed, nowhere in the government's extensive brief is there any support for the conclusion that generators who contracted with another to ship out or dispose of waste can be held liable under FWPCA. Therefore, the Court concludes the government's claim for relief under § 311(e) of FWPCA against the generator defendants should be dismissed. *See* Note, *Liability for Generators of Hazardous Waste: The Failure of Existing Enforcement Mechanisms*, 69 Georgetown L.J. 1047, 1056 (1981); 116 Cong.Rec. H.9327 (daily ed. March 25, 1970) (Remarks of Rep. Cramer).

Similarly, the government's claims under § 7003(a) of RCRA against the generator defendants must also be dismissed. While there is authority for the proposition that § 7003 applies to inactive sites, *United States v. Price*, 688 F.2d 204, 213–14 (3rd Cir.1982), the Court is aware of no case authority or contemporaneous legislative history which indicates that generators could be liable under RCRA. Indeed, the evidence is to the contrary. CERCLA was enacted because existing law (RCRA and FWPCA) was inadequate for dealing with the problem of hazardous waste sites. H.R.Rep. 1016, *supra.* 5 U.S.Code & Cong. & Ad.News 6119, 6120 (1980). For example, during the CERCLA debates, Representative Brown remarked:

> [Superfund] fills a critical gap in current law by providing EPA with the *authority* and *resources* to clean up inactive hazardous waste sites. There is no other authority under which the EPA can act at this time. Neither the Resource Conservation and Recovery Act nor the Clean Water Act provides adequate authority .... (Emphasis added).

126 Cong.Rec. H9176 (daily ed. September 19, 1983). CERCLA provided the resources to clean up hazardous waste sites by creating a fund and by imposing liability on the generators of the waste. It is clear to this Court that both the resources were unavailable under RCRA. *See United States v.*

*Waste Industries,* 556 F.Supp. 1301 (E.D. N.C.1982).

■ Finally, defendants argue the government has not alleged facts which trigger § 9606 of CERCLA. In particular, they contend the Greenup site does not pose an "imminent and substantial" risk of harm to public health or the environment. The government has already completed a partial cleanup of the Greenup site and is presently involved in a study to determine what dangers remain. While this cleanup has presumably dealt with any emergencies that existed at the site, the government has properly alleged the existence of a "threatened release of a hazardous substance" that poses an imminent and substantial endangerment.

### III. GOVERNMENT'S CLAIM FOR COST REIMBURSEMENT UNDER SECTION 9607 OF CERCLA

■ Defendants' argument for dismissal of the reimbursement counts is twofold. First, defendants argue plaintiff's claim under § 9607 is premature because § 9607 is triggered only when all the costs of the cleanup have been incurred. The government has only incurred a portion of the total projected cleanup cost. Secondly, defendants argue dismissal is appropriate because the government has not properly alleged that it has conformed with each element of the National Contingency Plan as to costs already incurred, a prerequisite to recoupment under § 9607.

In response to defendants' ripeness argument, the government argues § 9607 only requires that *some* costs be incurred before an action can be maintained. The Court agrees. Section 9607 provides that responsible parties shall be liable for "all costs of removal or remedial action *incurred* ...." (Emphasis added). In *Brown v. Georgeoff,* 562 F.Supp. 1300, 1315–16 (N.D.Ohio 1983), the court held Ohio could maintain a lawsuit under § 9607 although Ohio had only incurred 10% of its total prayer for damages. Similarly, in *United States v. Price,* No. 80–4104, 557 F.Supp. 1103 (D.N.J. July 28, 1983) at 13, the court dismissed the claims under § 9607 because the EPA had not yet undertaken *any* cleanup effort. The *Price* court cited *Brown* for the proposition that once the cleanup process had started, action under § 9607 was ripe. Thus, because it is undisputed that the government has incurred substantial costs at the Greenup site, the government's claims for recoupment are proper.

■ Defendants also move for dismissal arguing the government has not properly alleged that the actions taken by the EPA are consistent with the National Contingency Plan (NCP). The NCP sets forth the procedures, techniques, materials, equipment and methods to be employed in identifying, removing or remedying releases of hazardous substances. Section 9607 states that the various defendants are only liable for those costs incurred which were not inconsistent with the NCP. In paragraph 106 of the First Amended Complaint, the government alleges in conclusory terms that the costs incurred to date are consistent with the NCP.

While it may be true the government has failed to comply with the NCP at the Greenup site, the Court cannot resolve this issue at the pleading stage. Since the federal rules only require notice pleading and the Court must accept all factual allegations as true, the Court cannot dismiss the reimbursement counts on this basis. *Accord, City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1144 (E.D. Pa.1982).

### IV. MOTION TO DISMISS STATE'S COMPLAINT IN INTERVENTION

■ About a month after the government filed its First Amended Complaint, the State filed its Complaint in Intervention. The State's Complaint tracks the government's except for the allegations under the Illinois Environmental Protection Act, *Ill.Rev.Stat.,* ch. 111½, para. 1012(a). Defendants raise two arguments in favor of dismissal: (1) the State fails to allege the generators had any control over the Greenup site, a prerequisite under para. 1012(a); and (2) the State lacks standing to

bring the federal law claims under RCRA and FWPCA. The second argument has been rendered moot by the Court's finding that the government may not maintain an abatement action against the generator defendants under either the FWPCA or RCRA.

The generator defendants argue that generators which contract with another to dispose of waste cannot be held liable under the Illinois statute. Paragraph 1012(a) provides:

No person shall *cause* or *threaten* or *allow* the discharge of any contaminants into the environment in any state so as to cause or tend to cause water pollution in Illinois .... (Emphasis added).

The allegations in the Complaint are that the generator defendants "arranged for," "paid for" and "sent" hazardous waste to Greenup.

The Court finds that the allegations in the Complaint in Intervention are insufficient to impose liability on the generator defendants under para. 1012(a). While there are no cases factually similar to this case, Illinois courts have required more involvement with the actual pollution than the alleged involvement of the generator defendants. In *Phillips Petroleum v. Ill. Env. Pro. Agency*, 72 Ill.App.3d 217, 28 Ill.Dec. 453, 390 N.E.2d 620, 623 (1979), hazardous fumes were released when a train derailed and a tank car was punctured. Phillips owned the tank car and loaded the dangerous chemical, but a railroad company had control of the train when it derailed. The court held that Phillips was not liable under the Act because, although the Act does not require allegations of intent to pollute or even knowledge of the pollution, the Act does not impose strict liability. Specifically, the court held that Phillips did not exercise sufficient control over the source of the pollution to have "caused," "threatened" or "allowed" the pollution. *Id.* Similarly, in the instant case it is not alleged that the generators exercised any control over the source of the pollution.

The cases cited by the State all refer to *owners* of property who are held liable for pollution that originated on their property. *Hindman v. Env. Pro. Agency*, 42 Ill. App.3d 766, 1 Ill.Dec. 481, 356 N.E.2d 669 (1976); *Environmental Protection Agency v. James McHugh Const. Co.*, 4 Ill.P.C.B. 511 (1972). These cases stand for the proposition that owners will not be able to insulate themselves from liability by establishing lack of intent or even knowledge of the pollution because of the control they have over their property. Nonetheless, even owners are not strictly liable. In *Alton and Southern Railway v. Illinois Pollution Control Board*, 12 Ill.App.3d 319, 297 N.E.2d 762 (5th App.Dist. 1973), the court released absentee owners from liability for pollution because the land at issue was leased to a third person and the owners did not know of the illegal disposal of wastes.

The Court finds that it would be an unwarranted extension of Illinois law to impose liability under para. 1012(a) on off-site generators. If the Court holds that the off-site generators "caused" or "allowed" the leakage at Greenup based on the allegations in the Complaint in Intervention, the Court in effect would be imposing strict liability on all those in the chain who handled the hazardous wastes. Illinois courts have expressly refused to impose strict liability under the Act. *Phillips Petroleum v. Ill. Env. Pro. Agency, supra.*

## V. CAM–OR'S MOTION TO ADD INDISPENSABLE PARTIES

Cam-or argues that the government is aware of numerous parties who disposed of hazardous wastes at the Greenup site who were not added as defendants in this action. Cam-or moves for dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure arguing that these absent parties are indispensable within the meaning of Rule 19.

Cam-or's argument is related to the issue of joint and several liability under CERCLA discussed above. Cam-or concedes that if the Court imposes joint and several liabil-

ity, its Rule 19 argument must fail because it is well settled that a plaintiff may choose between joint tortfeasors when bringing an action. *Pasco International v. Stenograph Corp.*, 637 F.2d 496, 503 (7th Cir. 1980); *United States v. Price*, 523 F.Supp. 1055, 1075 (D.N.J.1981).

Moreover, even if Cam-or can establish that joint and several liability should not be imposed, the Court does not see how Cam-or will be prejudiced from the absence of other generators and transporters. If Cam-or can establish that its contribution to the injury is divisible and· capable of apportionment, it will not run the risk of multiple liability. Further, Cam-or can protect itself through the impleader provision of Rule 14. *Pasco International, supra.*

## VI. PETROLITE'S MOTIONS TO DISMISS

Petrolite has filed five motions raising numerous arguments. Three arguments remain which have not been rendered moot by the Court's discussion above. First, Petrolite contends plaintiffs have not properly alleged any nexus between Petrolite and the alleged leakage at Greenup. Second, Petrolite argues that the only substance it sent to Greenup, sulfuric acid, is not a discarded material within the meaning of RCRA. Third, Petrolite moves to strike references in the Amended Complaint to complex chemicals which are not specifically alleged to be connected with Petrolite.

 Petrolite's first two arguments require a resolution of factual disputes. Petrolite claims, and seeks to prove by way of affidavit, that the sulfuric acid it sent to Greenup was actually desired by the owner and operator of the site to treat other chemicals. Petrolite also seeks to establish that none of the sulfuric acid is in the lagoons that are causing the injury to the environment. The government counters these assertions with facts of their own. The government contends Petrolite paid to have the acid removed to Greenup, not the other way around, and that sulfuric acid is presently in the pits and lagoons at Greenup.

Petrolite has transformed its Motion to Dismiss into one for summary judgment by presenting matters outside the pleadings. Nonetheless, the Court finds that the government has adequately demonstrated that material issues of fact remain as to Petrolite's liability. Thus, Petrolite's Motions to Dismiss will be denied.

 Petrolite's Motion to Strike must also be denied. Petrolite argues that the government's Amended Complaint does not adequately reflect the limited role Petrolite played at Greenup; and thus, allegations which describe the hazardous wastes at Greenup, without specifying their source, are scandalous and prejudicial. The Court finds this argument to be wholly without merit. Because Paragraph 23 of the Amended Complaint states that Petrolite shipped only sulfuric acid to Greenup, Petrolite's limited involvement is clear to the reader of the Amended Complaint. Thus, the Court finds no prejudice in the pleading techniques utilized by the government.

## CONCLUSION

In light of the above discussion, the Court makes the following findings:

1. Generator defendants' Motion to Dismiss Claims 9, 10, 11 and 12 based on CERCLA is hereby DENIED.

2. Generator defendants' Motion to Dismiss Claims 2 and 4 based on the FWPCA is hereby GRANTED.

3. Generator defendants' Motion to Dismiss Claims 1 and 3 based on the RCRA is hereby GRANTED.

4. Generator defendants' Motion to Strike the term joint and several liability from Claims 9, 10, 11 and 12 based on CERCLA is hereby DENIED.

5. Generator defendants' Motion to Dismiss portions of the Complaint in Intervention is hereby GRANTED, and claims 1, 2 and 10 of the Complaint in Intervention against the generator defendants are hereby DISMISSED.

6. Cam-or's Motion to Dismiss for Failure to Join Indispensable Parties is hereby DENIED.

7. Petrolite's Motions to Dismiss and Motion to Strike are all hereby DENIED.

IT IS SO ORDERED.