**ALLIED CORPORATION, et al., Plaintiffs,**

**v.**

**ACME SOLVENTS RECLAIMING, INC., et al., Defendants.**

No. 86 C 20377.

United States District Court, N.D. Illinois, W.D.

May 13, 1988.

Leonard A. Nelson, Schoenberg, Fisher & Newman, Ltd., Chicago, Ill., for Illinois Bronze Paint Co.

James R. Schirott, Charles E. Hervas, James G. Sotos, Frank J. Bochte, Schirott

& Associates, P.C., Itasca, Ill., for Syn-Tech, Ltd.

Carey S. Rosemarin, Anthony G. Giglio, Francis X. Arossi, Jr., Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for Federated Paint Mfg. Co.

John L. Ropiequet, Laurence H. Kallen, Jeffrey T. Massari, Arnstein, Gluck, Lehr & Milligan, Chicago, Ill., for James B. Day & Co.

Robert B. Hurwitz, Delman & Hurwitz, Skokie, Ill., for Modine Mfg. Co.

Michael J. Merlo, Carolyn S. Hesse, Pretzel & Stouffer, Chtd., Chicago, Ill., for Universal Chemicals & Coatings, Inc.

John M. Kyle, III, Barnes & Thornburg, Indianapolis, Ind., Robert H. King, Jr., Roger K. Heidenreich, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Lillie Indus. Coatings, Inc.

J. Andrew Schlickman, James F. Warchall, Stephen D. Ramsey, Sidley & Austin, Chicago, Ill., for Barrett Varnish Co.

Charles F. Thomas, Charles F. Helsten, Thomas & Hinshaw, Culbertson, Rockford, Ill., William J. Holloway, David C. McCormack, Thomas S. Malciauskas, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for Earl Scheib of Illinois, Inc.

Melvin S. Newman, Leonard A. Nelson, Schoenberg, Fisher & Newman, Ltd., Chicago, Ill., for Rolisa Corp.

Richard W. Cosby, Chicago, Ill., Terry R. Bossert, McNees, Wallace & Nurick, Harrisburg, Pa., for Harley–Davidson, Inc.

Harvey M. Sheldon, Timothy M. Kelly, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Continental Can Co., Inc.

Richard Haldeman, Scott Sullivan, Williams & McCarthy, Rockford, Ill., Robert T. Stewart, James S. Teater, Jones, Day, Reavis & Pogue, Dallas, Tex., for Whittaker Corp., Gordon Bartels & Co.

Joan M. Hall, Charles L. Barker, Jenner & Block, Chicago, Ill., Larry D. Espel, G. Mark Whitehead, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for SCM Corp.

Andrew H. Perellis, Dixie L. Laswell, Thomas M. Giller, Gessler, Wexler, Flynn,

Laswell & Fleischmann, Chicago, Ill., for John L. Armitage & Co.

Jack D. Ward, Reno Zahm Law Firm, Rockford, Ill., William W. Moir, III, Hayes, Neumann, Humke, Moir & Van Akkeren, Sheboygan, Wis., for Sheboygan Paint Co., Inc.

Eugene R. Pigatti, Rockford, Ill., Leo G. Stern, Fredrikson & Byron, P.A., Minneapolis, Minn., for Valspar Corp.

Edward Purcell, Purcell & Wadrope, Chicago, Ill., Thomas H. Hill, Barbier, Petersmarck, Tolleson, Mead, Paige & Carlin, P.C., Birmingham, Mich., for Seed-O-Laq Chemicals.

John Lingner III, Freeborn & Peters, Chicago, Ill., for Dexter Corp.

Clifton A. Lake, Rooks, Pitts & Poust, Chicago, Ill., for Henkel Corp. & Rheem Mfg. Co.

Bradley T. Koch, Kim M. Casey, Roberta L. Holzwarth, Bryan G. Selander, Holmstrom & Green, P.C., Rockford, Ill., Jeffrey T. Gilbert, Arnold A. Pagniucci, Charles J. Ryan, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for Hydrosol, Inc.

James Russell, James A. Vroman, Winston & Strawn, Chicago, Ill., for General Motors Corp.

Clifton A. Lake, Jeryl Dezelick, Rooks, Pitts & Poust, Chicago, Ill., for Bell & Howell Co. and Textron, Inc.

Raymond T. Reott, Robert L. Graham, Jenner & Block, Chicago, Ill., for Chase Products Co.

Nina Stillman, Paul T. Parker, Jeanne M. Cole, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Sullivan Varnish Co.

John R. Adams, Ralph W.F. Lustgarten, Yvonne M. Kaminski, Taylor, Miller, Sprowl, Hoffnagle & Merletti, Chicago, Ill., for Reliance Universal, Inc.

Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for U.S.E.P.A.

Thomas M. Giller, Andrew H. Perellis, Dixie L. Laswell, Gessler, Wexler, Flynn, Laswell & Fleischmann, Ltd., Joel H. Fenchel, Ian Brusslan, David W. Inlander, Fischel & Kahn, Ltd., Chicago, Ill., for Coatings & Chemicals Corp.

Kay L. Pick, Altheimer & Gray, Chicago, Ill., for Sundstrand Corp.

James I. Rubin, Anthony E. Rothschild, Butler, Rubin, Newcomer Saltarelli & Boyd, Chicago, Ill., for Reynolds Metals Co.

## ORDER

ROSZKOWSKI, District Judge.

The plaintiffs bring this case under the Comprehensive Environmental Response, Compensation, Liability Act, 42 U.S.C. §§ 9601, et seq., ("CERCLA") for recovery of costs incurred in the clean up of a hazardous waste site. The defendants have moved for dismissal of the case for lack of subject matter jurisdiction, for dismissal of the complaint under Rules 12(b)(6) and 12(c), and for summary judgment. The Magistrate in September, 1987, considered the motions and recommended that the court deny all four. *See*, Magistrate's Report and Recommendation, September 3, 1987.

The case is now before the court on the defendants' objections to the Magistrate's Report and Recommendation. For the reasons that follow the court adopts the Magistrate's recommendation that the motions be denied.

## BACKGROUND

The facts of this case [1] span nearly three decades and reveal an all too familiar story of environmental degradation, subsequent attempts at repair, and legal battle over ultimate responsibility.

Beginning in 1960 and continuing until 1972, the defendant Acme Solvents Reclaiming, Inc. operated a waste disposal site in Winnebago County, Illinois. Acme

---

1. The defendants have submitted with their 12(b)(1) and rule 56 motions exhibits evidencing facts not alleged on the face of the complaint. For the purpose of background, the court at this juncture treats alike the pleaded facts and the facts sought to be established by exhibit. The following scenario arises from this aggregate of information.

customers consisted, primarily, of solvent generators. The plaintiffs to this suit and all defendants (except Acme) were industrial customers of the waste disposer. Acme provided these customers with distillation and disposal of waste solvents. Distillation involved separating from the solvents contaminants which comprised or contained hazardous substances. Disposal of the resultant contaminants was made on-site.

Years after Acme ceased its operations, surrounding communities became concerned with the possibility that the hazardous wastes on the Site were contaminating the environment. In response to these concerns, the United States Environmental Protection Agency, together with officials at the Illinois Environmental Protection Agency, commenced in 1983 a detailed investigation of the site. The investigation confirmed the fears of the community and revealed a threatened release into the environment of hazardous substances. In accordance with CERCLA, the USEPA placed the Acme site on the National Priorities List.[2]

The agencies followed their investigation with a two-year study into the feasibility of various cleanup methods. In the spring of 1985, the USEPA sent notices to each plaintiff in this suit, to each defendant (or its predecessor in interest), and to others, informing them that the government considered them to be potentially responsible for implementing a clean-up plan.[3]

On September 27, 1985, the agency issued a Record of Decision (ROD) in which it selected its preferred course. The ROD called for excavation and on-site incineration of core waste materials, and the off-site disposal of non-incinerable wastes.

After issuance of the ROD, the plaintiffs continued to express their concern, which they had articulated during the proceedings leading to the ROD, over the efficacy and cost of the experimental method of incineration. In accordance with these concerns, the plaintiffs urged the USEPA to reconsider its decision. The USEPA did not, and still has not, formally responded to the request for reconsideration.

In July, 1986, the plaintiffs initiated a response action at the Site. The plaintiffs' plan differed substantially from the plan which the EPA had delineated in its ROD. The plaintiffs' plan called for excavation and off-site disposal of core materials, rather than for on-site incineration. By November, 1986, the plaintiffs substantially completed the removal of over 41,000 tons of non-core materials to licensed off-site landfills.

Though the plaintiffs' plan was at variance with the EPA's ROD, the plaintiffs maintained dialogue with the Agency and in September, 1986, entered into a consent order by which the two parties agreed to a plan for cleaning up the groundwater beneath the Site. In July, 1987, the USEPA issued to the plaintiffs its Certificate of Completion and Covenant Not to Sue. The document certified that the groundwater clean-up had "been duly performed by the participants pursuant to a Work Plan approved by USEPA and IEPA" and that the ground water clean-up was consistent with the National Contingency Plan. The document further contained the USEPA and IEPA covenants not to sue or take administrative action against the plaintiffs for the performance or non-performance of the groundwater clean up.

To date, the plaintiffs have substantially completed clean up of the Acme site, and in so doing, have incurred in excess of nine million dollars in costs. What remains for completion of the project is removal of the excavated core materials to off-site landfills.

---

**2.** Under Section 105 of CERCLA, the president, through the United States Environmental Protection Agency ("USEPA"), is obligated to compile and maintain a list of "national priorities among the known releases or threatened releases throughout the United States." 42 U.S.C. § 9605(a)(8)(B) (1986). A release of a hazardous substance is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22) (1986).

**3.** The defendant Federated Paint Manufacturing Co., Inc. contends that it did not receive notice. The court makes no findings of fact as to this issue.

The defendants in the present action have not shared in the costs of cleanup. The plaintiffs in 1986 filed their complaint with this court seeking to force the defendants to do some sharing.

## DISCUSSION

Congress enacted the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601–9657 (1980), to expand and strengthen the framework of national hazardous substance response previously laid down under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6987. Specifically, CERCLA seeks to expedite the cleanup of hazardous waste sites and to ensure the allocation of cleanup costs among responsible parties. 126 Cong.Rec. 30, 932 (1980) (remarks of Sen. Randolph). *See also,* Note: *Superfund Settlements: The Failed Promise of the 1986 Amendments,* 74 Va.L.Rev. 123, n. 2. Because CERCLA provides for a depository of monies to be used to finance hazardous waste cleanups, the Act has been nicknamed "Superfund".

The major provisions of Superfund create a Monopoly Game of environmental rights and liabilities.[4] Section 104 of the Act gives the USEPA[5] the authority to respond directly to releases or threats of releases into the environment of hazardous substances. 42 U.S.C. §§ 9604. A response may take the form of short-term removal actions, or long-term remediation, or both. 42 U.S.C. §§ 9601(25). The USEPA finances its direct response actions through the fund, but may later seek reimbursement from responsible parties of the monies depleted. 42 U.S.C. §§ 9607.

CERCLA also arms the Agency with abatement authority under Section 106. 42 U.S.C. §§ 9606. The USEPA may issue administrative orders to compel responsible parties to undertake response action, or may file suit in federal court for the same purpose. Parties who clean up pursuant to Section 106 may seek reimbursement from the fund under Sections 112 and 113 or may, under Section 107, pursue a cost recovery action in federal court against nonparticipating responsible parties. 42 U.S.C. Section 9612, 9613 and 9607.

Parties who voluntarily initiate response actions may also take advantage of Section 107. Those "potentially responsible parties" (PRP's) liable under Section 107 include past and present owners and operators of waste disposal sites and waste generators who arranged with the owner or operator for disposal of wastes. 42 U.S.C. §§ 9607(a)(2) and (3).

The government and private parties may to some extent detour through settlement the avenues of response and recovery outlined above. Though the 1980 Act does not expressly provide for settlement, the USEPA has utilized settlement to facilitate cleanup and to resolve cost allocation disputes. *Fiscal 1986 Superfund Figures Reflect Program's Disruption, Official Says,* 17 Env't.Rep. (BNA) 1220, 1221 (Nov. 21, 1986). In 1985, the Agency memorialized its settlement policy in writing. *See,* EPA Hazardous Waste Enforcement Policy, 50 Fed.Reg. 5034 (1985).

In large part to codify and fill gaps in the USEPA settlement procedures, Congress in October, 1986, passed the Superfund Amendment and Reauthorization Act of 1986 (SARA). Pub.L. No. 99–499, 100 Stat. 1615 (codified in Titles, 10, 26, 29, 33 and 42 U.S.C.). In addition to reforming such things as intragovernmental relations and cleanup criterion, SARA expressly authorizes the USEPA to enter into settlement agreements with PRP's. 42 U.S.C. §§ 9622. Included in the provisions on settlement is a requirement which limits a PRP's recovery under Section 107. Section 122(e)(6) of SARA explicitly mandates, as a prerequisite to Section 107 cost recovery, EPA approval of PRP response in situations where the EPA has initiated an inves-

---

**4.** The Act even contains some "go to jail" rules. *See, e.g.,* 42 U.S.C. §§ 9603(b) (1986).

**5.** The President delegated much of his authority under CERCLA to the United States Environmental Protection Agency. Exec. Order No. 12,-316, 3 C.F.R. 168 (1982), *reprinted in* 42 U.S.C. § 9615 note at 544–47 (1982), as amended by Exec. Order No. 12,418, 3 C.F.R. 187 (1984).

tigation of the site. 42 U.S.C. §§ 9622(e)(6).

The central issue in the present case concerns this new agency approval requirement. Because the plaintiffs conducted their response to the Acme Site over a pre- and post-SARA period of time, the court must determine whether the pre-SARA law applies or whether, instead, the new law mandating EPA approval is applicable.

## EPA APPROVAL

To state a cause of action under Section 107 for recovery of costs of response, the plaintiffs must allege that the costs which they incurred were both "necessary" and "consistent with the national contingency plan." 42 U.S.C. §§ 9607. The National Contingency Plan (NCP) is a set of USEPA regulations which describe procedures and standards for responding to releases of hazardous substances. *See,* 40 CRF § 300.1–300.81 (1987); *Walls v. Waste Resource Corp.,* 761 F.2d 311, 318 n. 5 (6th Cir.1985).

The parties do not dispute that to show consistency with the NCP, the plaintiffs must prove that they took the steps outlined in the NCP. The defendants contend, however, that consistency requires also that the EPA approve the response action. This proposition, the defendants assert, is especially true where the EPA institutes a remedial investigation and feasibility study prior to the time the private party undertakes the response action. The defendants also argue that costs are "necessary" only when they are incurred in the implementation of an EPA-approved response.

In determining whether the plaintiffs are required to plead and prove EPA approval of their response action, the court will first search the pre-SARA law for an approval requirement.

## I. The 1980 Act

 In the first reported case on the issue, the district court for the Southern District of Florida held that pre-SARA CERCLA implicitly requires PRP's to receive EPA approval of response actions. *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437 (S.D.Fla.1984).

*See also, Artesian Water Co. v. Government of Newcastle County,* 605 F.Supp. 1348 (D.Del.1985); *Marmon Group, Inc. v. Rexnord,* No. 85 C 7838, slip op. (N.D.Ill. June 16, 1986) [available on WESTLAW, 1986 WL 7070]. Later courts split from the decision in *Bulk,* citing the statute and the preamble to the NCP to support the conclusion that neither necessity nor consistency require a showing of EPA approval. *See, Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 840 F.2d 691 (9th Cir.1988); *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887 (9th Cir.1986); *Pinole Point Properties v. Bethlehem Steel Corp.,* 596 F.Supp. 283 (N.D.Calif. 1984); *Fishel v. Westinghouse Electric Corp.,* 617 F.Supp. 1531 (D.C.Pa.1985); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D.Mo.1985); *City of New York v. Exxon Corp.,* 633 F.Supp. 609 (S.D.N.Y.1986).

The parties to the present case have briefed the issue, mostly reiterating the arguments which the federal courts on both sides of the controversy have so fully considered. After reviewing the cases and the briefs, the court finds that the 1980 Act contains no approval requirement.

Two months ago, the Ninth Circuit in *Cadillac Fairview* held that a party seeking to recover its costs of response need not await approval of or action by any governmental entity. *Cadillac Fairview,* 840 F.2d at 694–95. The court first noted that Section 107 contains no express approval requirement. In contrast, Section 111(a)(2), which relates to cost recovery against the fund, explicitly provides that costs are recoverable against the fund only if such costs are approved under the NCP and certified by the responsible federal official. 42 U.S.C. §§ 9611(a)(2) (1980). This court agrees with the Ninth Circuit that the inclusion of an express approval requirement under one part of the Act—Section 111(a)(2)—reflects a certain deliberateness in Congress' exclusion of a such a requirement under Section 107.

The *Cadillac Fairview* court recognized further that CERCLA provides no mechanism through which a party could seek

approval. *Cadillac Fairview,* 840 F.2d at 694. Stated the court:

In *Wickland,* we observed that the lack of any procedure in CERCLA by which a private party could seek prior governmental approval of a cleanup program indicated that such approval was not a prerequisite to an action under section 107(a). *See* 792 F.2d at 892. We find that reasoning persuasive here. Neither CERCLA nor the national contingency plan describes a procedure whereby a private party could coordinate its response efforts with those of a local or state government or seek the approval of state or local governmental entities before commencing a response action. Indeed, there is no indication in the statute that prior approval or action by a state or local government is either necessary or desirable.

Notwithstanding the clear logic of *Cadillac Fairview,* the argument has been made that Section 104 of CERCLA contemplates a Section 107 approval mandate. Section 104 provides that the President is authorized to take response action at a site

unless the President determines that such removal and remedial action will be done properly by the owner or operator of the vessel or facility from which the release or threat of release emanates, or by any other responsible party.

42 U.S.C. Section 9604.

The defendants contend that Section 104 authorizes the USEPA to approve private party responses and that this approval is a precondition to private party cost recovery under Section 107. As the defendants recognize, their argument is valid only if there is a link between 104 and 107 which evidences congressional intent to make 107 cost recovery contingent upon EPA's 104 determination.

Clearly, Section 104 does not by its language create the necessary link. Further, the necessity requirement of Section 107 does not "carry" 104 approval over to 107. It is suggested that "necessary" conotes a compulsory or mandatory cost of response which would "flow from a mandatory government approved plan." Memoran-dum in Support of Motion of Continental Can Company to Dismiss Plaintiff's Complaint, pg. 6. This equation is not self-evident. While it is true that the dictionary offers "compulsory" as one definition of "necessary", necessary is also defined as "logically unavoidable". Webster's New Collegiate Dictionary 761 (1979). A cost, therefore, may be logically unavoidable but at the same time be uncompelled by the USEPA. The 104 argument merely begs the very question which this court seeks to answer: do necessity and consistency encompass a prior approval mandate?

The court notes that the link between Sections 104 and 107 which is absent in pre-SARA CERCLA, is now clearly manifested in the 1986 amendments. A discussion of SARA's amendments to Section 104 and SARA's new Section 122(e)(6), and their relation to 107, is set forth later in this opinion. At this juncture, the court points out that SARA's unmistakable prior approval mandate, and the mandate's explicit tie-in with Sections 104 and 107, highlight the absence of any comparable provisions in pre-SARA CERCLA.

The real issue before the court is not "the wisdom of allowing Section 107(a) response action to proceed without government authorization." *Id.* Rather, the court's narrow inquiry focuses upon what Congress provided for and what it did not. The approval requirement which the defendants seek to discern from the 1980 Act simply is not there.

Without so much as a hint in the 1980 Act that PRP's are under a duty to seek prior approval, subsequent congressional statements that such a duty exists under the 1980 Act are irrelevant. As noted earlier, the 1986 amendments under SARA explicitly require USEPA approval of private party responses under certain circumstances. New Section 122(e)(6) is entitled "Inconsistent Response Action" and provides:

When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no

potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

42 U.S.C. §§ 9622(e)(6).

In its Conference Statement on the proposed Superfund Amendment, the Congressional Committee of Conferences indicated that Section 122(e)(6) "is included in the conference substitute *to clarify* that no potentially responsible party may undertake any remedial action at a facility unless such remedial action has been authorized by the President." Joint Explanatory Statement of the Committee of Conference, 1986 U.S.Code Cong. & Ad.News 2835, 3347 (emphasis supplied). Likewise, in its report of October 3, 1986, the Senate expressed the sentiment that Section 122(e)(6) is a clarifying amendment. Cong.Rec., October 3, 1986, §§ 14,919. If, indeed, Section 122(e)(6) is simply a clarification of the law as it existed under the original Act, then the plaintiffs to the present case were obligated to secure USEPA approval of their response.

The legislative history of a subsequent act or amendment is entitled to substantial consideration in interpreting a prior statute. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980). The views of a subsequent Congress cannot, however, "override the unmistakable intent of the enacting one." *Id.* As already noted, nothing in the 1980 Act evidences a congressional intent to impose a prior approval requirement upon parties seeking to recover costs under Section 107. The 1980 Congress' intent is "unmistakable", and no amount of congressional backpedaling in 1986 can change what was intended six years earlier. The 1986 Congress had the authority to shape the present law as it saw fit; it did not have the authority to shape the law of 1980.[6]

For the reasons stated above, the court holds that the Act of 1980 did not require the plaintiffs to secure as a precondition to cost recovery under Section 107 USEPA approval of remedial actions undertaken prior to October 17, 1986.

## II. The 1986 Amendments

 Having concluded that the 1980 Act imposes no prior approval requirement, the court now turns to the 1986 amendments.

Section 122(e)(6) of SARA leaves no doubt generally as to the duty of PRP's to secure, under certain circumstances, EPA authorization for those remedial actions which they seek to undertake. The parties dispute, however, the application of Section 122(e)(6) to the present case. The defendants contend that Section 122(e)(6) applies retroactively to those remedial actions which the plaintiffs undertook prior to the effective date of SARA, and that the Section also applies prospectively, to govern the remedial actions undertaken on or after

---

**6.** The defendants Gordon Bartels Company and Whittaker Corporation have also contended that the procedures of the NCP "plainly contemplate a single evaluation process and the selection by the lead agency of the single, best remedial alternative pursuant to the regulatory criteria." Since the EPA was the "lead agency", the defendants submit, the remedy selected by the EPA "became the one and only extent of remedy under " the NCP. Memorandum in Support of Motion of Defendants Bartels Company and Whittaker Corporation for Partial Judgment on the Pleadings, pg. 9.

In effect, the defendants seek an interpretation of the NCP. An agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation. *Production Tool v. Employment & Training Admin.*, 688 F.2d 1161, 1165 (7th Cir.1982). The USEP* in its Preamble to the 1985 NCP ac-

knowledged that, though unlikely, responses may overlap. However, the EPA believed that such situations "are better addressed individually than by revising the NCP." 50 FR 47, 912, 47 934, (Nov. 20, 1985).

It is clear that in making these statements, the EPA assumed that nothing in the NCP prevented an overlapping of private party and government responses. Implicitly, then, the EPA interpreted its own regulations as not mandating a single course of response. The EPA's interpretation is at odds with that of the defendants, for the crux of the defendants' argument is that the NCP prevents dual responses and demands, instead, a single course of action.

The EPA's interpretation is not clearly erroneous or inconsistent with the NCP. At best, the NCP is ambiguous as to the problem of overlapping responses. Under these circumstances, the EPA's interpretation is controlling.

the amendment's effective date. The plaintiffs dispute the first of these propositions. The court will consider them in reverse order after first discussing the function of Section 122(e)(6) in relation to the whole Act.

As in the 1980 Act, Section 104 of SARA authorizes the President to respond to releases or threatened releases of hazardous substances. Section 104, both before and after 1986, gives the President the discretion, however, not to respond if the President believes that a PRP will do the job properly. Now, under SARA, if the President decides that the job can be done properly by a PRP, the President may, in accordance with Section 122, allow the PRP to carry out the remedial action, conduct the remedial investigation, or conduct the feasibility study.

> Section 104 under SARA reads:
> When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study *in accordance with section 9622 [122] of this title.* (emphasis added).

42 U.S.C. §§ 9604(a).

Section 122 is entitled "Settlements". Subsection (a) of 122 authorizes the President to enter into a settlement agreement with a PRP for the performance of any response action "if the President determines that such action will be done properly by such person." 42 U.S.C. §§ 9622(a). Subsection (a) goes on to stipulate that

> If the President decides not to use the procedures in this section, the President shall notify in writing potentially responsible parties at the facility of such decision and the reasons why use of the procedure is inappropriate.

The EPA's authority under Section 104 to allow a PRP to undertake remedial action pursuant to a settlement agreement dovetails under Section 122(e)(6) with the PRP's ability to recover costs under Section 107. The title of Subsection (e)(6)—

"Inconsistent Response Action"—implicates the consistency element of Section 107. Subsection (e)(6) restricts a PRP's ability to undertake remedial actions where the EPA has already initiated a remedial investigation and feasibility study. If, notwithstanding EPA involvement at the site, a PRP undertakes a remedial action, its action will be deemed inconsistent with the NCP. However, if the EPA "authorizes" the remedial action, the action will not (if otherwise consistent) be inconsistent with the NCP.

The plaintiffs do not dispute the effect of Section 122(e)(6). They contend, however, that authorization under Section 122(e)(6) can be informal. More specifically, the plaintiffs assert that passive acquiescence by the EPA in remedial actions undertaken by PRP's constitutes the necessary authorization. The court disagrees.

SARA sets up a scheme under Sections 104, 106 and 122 for the selection through settlement of expeditious and effective remedies. 42 U.S.C. §§ 9622(a) (1986). A tripartite system of participation is the cornerstone of this settlement process under SARA. Section 122 calls for governmental, community and PRP input into the decisionmaking. *See e.g.,* public participation provision of 42 U.S.C. § 9622(d)(2) (1986). The settlement process involves notice followed by a moratorium on EPA enforcement actions or fund-financed remedial actions. The moratorium serves to encourage negotiations between responsible parties and the EPA. 42 U.S.C. §§ 9622 (1986). The EPA may by-pass the machinations of Section 122 only if it notifies all PRP's of its decision to do so, and further, only if it provides reasons for its decision. 42 U.S.C. §§ 9622(a).

As a form of authorization under Section 122(e)(6), passive acquiesence would be wholly at odds with the scheme of 122 and would undermine the policies 122 promotes. First, the court must assume that Congress deliberately placed Subsection (e)(6) within the provisions on settlement. Authorization under (e)(6) would, then, seem to relate in some way to the settlement process. This court believes that authorization

would take the form of an agreement between the EPA and the PRP which would govern the type and scope of remediation to be undertaken.

In holding that authorization under Section 122(e)(6) encompases settlement agreements, this court does not rule out other possible forms of authorization. Nevertheless, whatever else authorization might include, it clearly does not contemplate so informal a method as passive acquiescence. As already noted, Section 122 settlement procedures serve to promote the policy of environmentally sound and cost effective clean up through governmental, community and private party input into the decision-making process. In by-passing the safeguards of Section 122, passive acquiesence would serve to undermine this policy. Surely Congress did not intend under Section 122(e)(6) that, once the EPA initiates a remedial investigation and feasibility study, PRP's are free to undertake their own chosen form of remedy and then recover costs in federal court under the theory, "the agency didn't tell us we couldn't!" Authorization under Section 122(e)(6) cannot be proved by a showing of Agency passive acquiescence.

The court now turns to the question of how Section 122(e)(6) should be applied to the facts of this case.[7]

■ The effective date of a statute implicates conduct taken on or after that date. Application of the statute to such conduct is deemed prospective. The effective date may also serve to impose the dictates of the new statute upon cases pending on or after the date, regardless of when the conduct which is the subject of the cases occurred. Application of a new statute to conduct occurring before the effective date constitutes retroactive application of the statute.

■ Absent clear and unequivocal statements by Congress to the contrary, legislative enactments are presumed to operate prospectively and not retrospectively. *United States v. Security Indus. Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 412–13, 74 L.Ed.2d 235 (1982). As our Court of Appeals has implicitly recognized, this proposition is not at odds with the Supreme Court's 1974 rejection in *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 715, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974), of the presumption against retroactivity.[8] *United States v. Kairys*, 782 F.2d 1374, 1381 (7th Cir.1986). In *Bradley*, the Supreme Court used a vested rights or manifest injustice standard in determining whether it should apply retroactively the statutory provision before it. The Seventh Circuit in *Kairys* combined the *Security Indus. Bank* and *Bradley* approaches by applying the presumption against retroactivity while recognizing that the presumption "is even more appropriate when the statute affects vested rights." *Kairys*, 782 F.2d at 1381, citing *Bradley*, 416 U.S. at 720–21, 94 S.Ct. at 2020–21. Thus, in de-

---

7. The premise upon which this court is proceeding in its application of SARA is that the plaintiffs' Project is divisible into distinct remedial actions, some undertaken prior to October 17, 1986, and some after. Separation of the Project into component parts is necessary because Section 122(e)(6) applies to remedial actions, and not to "projects" or "plans". Accordingly, simply by virtue of having initiated the Project prior to October 17, 1986, the plaintiffs cannot be said to have "undertaken" prior to the effective date of Section 122(e)(6) all remedial actions contemplated by the Project. Exactly what "undertaken" means and exactly how the Project, if at all, is broken down into more than one remedial action are questions which this court will face at a later time upon motion for summary judgment.

 At the time the court considers these questions it will also rule on the issue which the

defendants Gordon Bartels Company and Whittaker Corporation have raised as to the definition of "remedial actions". Section 101(24) of CERCLA previously excluded from the definition of remedial action offsite transportation and disposal of hazardous substances except where the President has determined that such transportation and disposal are more cost effective, likely to create new capacity to handle hazardous wastes, or necessary to protect public health or the environment. 42 U.S.C. §§ 9601(24) (1980). In 1986, SARA amended the definition of remedial action to include offsite transportation and disposal. 42 U.S.C. §§ 9601(24) (1986).

8. Traditionally, decisional changes of law are presumed to have retroactive effect, while legislative changes carry with them a presumption against retroactive application.

termining whether Section 122(e)(6) should be applied retroactively, this court will employ the combination analysis of *Kairys*. The court will look to the statute for unequivocal congressional intent and, secondly, will look to the circumstances of the present case to determine if retroactive application of Section 122(e)(6) would work a manifest injustice. First, however, the court will explore the scope of prospective application of the section.

 Congress provided in SARA that, except as otherwise specified, the amendments were "to take effect on the enactment of this Act." P.L. 99–499, Section 4. SARA was enacted on October 17, 1986. Clearly, therefore, the requirements of Section 122(e)(6) govern, at least, those remedial actions undertaken on or after October 17. Accordingly, since the USEPA had initiated a remedial investigation and feasability study, the plaintiffs in the present case were barred from undertaking "any" remedial action at the Acme site after October 16 unless they received USEPA authorization for such action. Additionally, any costs incurred in performing unauthorized remediation are to be considered by this court as "inconsistent" with the NCP, and thus, not recoverable under Section 107.

This prospective application of Section 122(e)(6) is far from unfair. The plaintiffs were free prior to October 17, 1986, to undertake without EPA approval any remedial actions otherwise consistent with the NCP. Once the new requirements took effect, however, the plaintiffs became obligated, as all PRP's did, to structure their conduct in accordance with the new law. There is nothing inherently unfair in this result. The plaintiffs could have, and should have, sought out EPA approval of the remedial actions to be undertaken on or after October 17; apparently, they did not. It is inconceivable that the plaintiffs did not appreciate the risks they were taking once SARA became effective. Their undertaking of remedial actions after October 16, without EPA approval, seems a calculated risk; they lose on the draw unless they can plead and prove EPA authorization.

The plaintiffs have succeeded in pleading EPA authorization of some remedial actions undertaken after October 16, 1986. The plaintiffs have alleged the existence of an administsrative consent order. As to those remedial actions contemplated by the September 1986 consent order but undertaken after October 16, 1986, the court holds that the consent order could operate as EPA authorization under Section 122(e)(6). The consent order is the type of formal approval consistent with the policies underlying Section 122(e)(6). Accordingly, any remedial actions undertaken after October 16, 1986, but contemplated by the September, 1986 consent order will, for pleading purposes, be deemed authorized.

While SARA's effective date provision leaves no doubt as to the prospective application of Section 122(e)(6), it is ambiguous as to retroactivity. More accurately, the pronouncement is silent on this point. No other provisions of SARA, including Section 122(e)(6), break this silence to reveal an unequivocal congressional intent to apply Section 122(e)(6) retroactively.

Like the statute, the legislative history contains no such clear congressional statement of intent. It might be argued that the statements in the Conference Committee and Senate reports—that Section 122(e)(6) is intended as a clarifying amendment—evidence congressional intent to apply 122(e)(6) retroactively. This argument has some appeal but these statements do not go far enough to constitute the kind of clear and unequivocal manifestations of intent needed to overcome the presumption against retroactivity. Indeed, if the members of Congress truely believed that 122(e)(6) merely clarified the law under the 1980 Act (a belief this court has rejected as invalid), the question of retroactivity was never even contemplated.

Having decided that nothing in SARA or its legislative history reveal a congressional intent to apply Section 122(e)(6) retroactively, the court turns to the issue of whether retroactivity would, nevertheless, be proper under a manifest injustice analysis.

■ Retroactive application of a new law results in manifest injustice when the disappointment of private expectations outweighs the public interest in enforcing a new rule. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1084 (1st Cir.1986). In the present case, the private and public concerns balance out against retroactivity.

■ First, retroactive application would implement little, if any, of the public good promoted by Section 122(e)(6). Section 122(e)(6) protects the public by safeguarding the EPA's authority to direct the course of cleanup once the EPA becomes involved in such cleanup. Section 122(e)(6) operates as a deterrent, for it creates a financial disincentive to PRP's to undertake remedial actions not authorized by an involved EPA. As a deterrent, the real value of 122(e)(6) lies in its application to conduct arising on and after the Section's effective date. To phrase it negatively, there is no protection to be afforded the public by retroactively applying 122(e)(6), since retroactive application will not serve to deter. Absent a deterrent effect, retroactive application of Section 122(e) would simply operate to disallow one wrongdoer's recovery against a fellow wrongdoer; the public probably couldn't care less. The Supreme Court has recognized the futility of retroactively applying laws which operate primarily as disincentives. *See e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1306, 89 L.Ed.2d 452 (1986); *United States v. Leon*, 468 U.S. 897, 912–13, 104 S.Ct. 3405, 3414–15, 82 L.Ed.2d 677 (1984); *United States v. Peltier*, 422 U.S. 531, 538–539, 95 S.Ct. 2313, 2317–18, 45 L.Ed.2d 374 (1975).

Given the lack of public interest in retroactive enforcement of Section 122(e)(6), the disappointment of private expectations need not be exceptionally strong to render retroactivity manifestly unjust. A party's expectations may be grounded in its reasonable reliance on the old law. As noted earlier, at least six courts concluded that prior EPA approval was not a precondition to private party cost recovery under the 1980 Act. The USEPA, too, interpreted CERCLA as not mandating EPA approval. The Agency's interpretation is found in its preamble to the 1985 revised NCP. The EPA stated:

> EPA, however, believes that prior approval is unwarranted for response actions for which no claim against the Fund will be made and which are not taken in response to an enforcement action under CERCLA section 106.

> \* \* \* \* \* \*

> In this rule, EPA makes it absolutely clear that no Federal approval of any kind is a prerequisite to a cost recovery under Section 107 (except of course for government responses pursuant to Section 104 of CERCLA or private responses taken pursuant to section 106 of CERCLA or for responses for which claims will be presented to the Fund for reimbursement pursuant to section 112 of CERCLA).

Notwithstanding some judicial authority to the contrary, *see e.g., Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437 (S.D.Fla.1984); *Artesian Water Co. v. Government of Newcastle County*, 605 F.Supp. 1348 (D.Del.1985); *Marmon Group, Inc. v. Rexnord*, No. 85 C 7838, slip. op. (N.D.Ill. June 16, 1986), a reasonable, and correct, view prior to October 1986, was that EPA authorization was not required. The plaintiffs' reliance on the notion that they could proceed without EPA authorization was reasonable.

In light of both the questionable effect retroactive application of Section 122(e)(6) would have on the public good and the plaintiffs' reasonable reliance on the old law, retroactive application would be manifestly unjust. The court will not now require the plaintiffs to plead and prove that the EPA authorized their pre-SARA actions which, at the time, needed no authorization. The court declines to apply Section 122(e)(6) retroactively.

For the reasons set forth above, the court holds that the plaintiffs have stated a claim for recovery of costs incurred in the performance of (1) all remedial actions undertaken prior to October 17, 1986, and (2) those remedial actions undertaken on or

after October 17, 1986 contemplated by the September 1986 consent order. Accordingly, the court denies the motions to dismiss the amended complaint for failure to state a claim and denies in part the motion for partial judgment on the pleadings.

## ARBITRARY AND CAPRICIOUS STANDARD AND RECORD REVIEW

■ Under the auspices of a motion for summary judgment, the defendant Earl Scheib of Illinois, Inc. has moved for dismissal of Count I of the amended complaint. The defendant Earl Scheib contends that if the "plaintiffs' chosen remedy is not identical to the cost-effective response which EPA has identified, plaintiff must show that EPA's determination is arbitrary and capricious." Earl Scheib of Illinois, Inc.'s Memoranda in Support of Motion for Summary Judgment as to Counts I and II of Plaintiff's Complaint, p. 2. The corollary of this argument is that the court is limited in its consideration of this case to a review of the administrative record.

The statutory provision upon which the defendant Earl Scheib relies is SARA Section 113(j). 42 U.S.C. §§ 9613(j). That section provides:

(j)(1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record.

*　　*　　*　　*　　*　　*

(2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the

decision was arbitrary and capricious or otherwise not in accordance with law. 42 U.S.C. §§ 9613(j).

The defendant's contentions that this court's decisionmaking is limited to the administrative record and that the plaintiffs must plead and prove that the EPA's decision in selecting its preferred remedy was arbitrary and capricious, are valid only if the plaintiffs' cost recovery claims constitute objections to the ROD. The cost recovery claims would constitute objections only if in some way they challenged the ROD. This court has held that the plaintiffs' claim as to costs incurred in implementing remedial actions undertaken prior to October 17, 1986, is unrelated to the EPA's chosen remedy. Accordingly, since the claim is unrelated it can in no way be characterized as a challenge to the ROD nor can it be said to involve a review of the EPA's decision.

The claim as to costs incurred on or after the effective date of SARA, likewise, does not involve a challenge to, or review of, the Agency's chosen remedy. The plaintiffs are required under Section 122(e)(6) to plead and prove that the EPA authorized their remedial actions. If the plaintiffs cannot meet this burden, they may not recover costs incurred in performing remedial actions undertaken after October, 1986. The plaintiffs' task is this simple; it does not involve an added burden of proving that the EPA's decision in chosing its preferred remedy was arbitrary and capricious.

The court denies the defendant Earl Scheib's motion for summary judgment as it relates to the Section 113(j) argument.

## RIPENESS

■ The defendant Armitage seeks dismissal of this case under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. Specifically, the defendant contends that the case is not yet ripe for judicial review.[9] A case is unripe where it presents

9. The defendant Armitage also contends that under the doctrine of primary jurisdiction this court should defer exercising its jurisdiction over the plaintiffs' claims until such time as the EPA has had an opportunity to decide whether the plaintiffs' costs are necessary and consistent with the NCP. This court may defer adjudica-

tion where an agency's expertise would contribute to both the proper resolution of legal and factual issues and to uniformity of the law. *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed. 2d 126 (1956); *Bradford School Bus Transit v.*

no concrete issue for adjudication. *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 242–43, 73 S.Ct. 236, 239–40, 97 L.Ed. 291 (1952). Under such circumstances, there is no case or controversy before the court as required by Article III of the Constitution. *Id.* Ripeness also serves to prevent judicial interference with other organs of government. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

The defendant Armitage does not dispute that a case or controversy under Section 107 of CERCLA arises once the plaintiffs incur costs of response. *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1430 (S.D.Ohio 1984); *United States v. Wade*, 577 F.Supp. 1326, 1335 (E.D.Pa.1983). The defendant proposes, however, that such costs must only be those incurred in the performance of tasks delineated in the EPA's ROD. According to the defendants' analysis, the case will not be ripe "until all tasks required by the EPA in [the] initial phase of response have been completed."[10] Memorandum of Law in Support of the Motion of John L. Armitage & Co. to Dismiss for Lack of Ripeness, pg. 7.

Commentators have noted that the ripeness doctrine is frequently used, not as a measure of jurisdiction, but as a means of challenging the contours of a cause of action. *See e.g.*, Nicol, *Ripeness and the Constitution*, 54 U.Chi.L.Rev. 153 (1987); Vining, *Direct Judicial Review and the Doctrine of Ripeness in Administrative Law*, 69 Mich.L.Rev. 1443, 1522 (1971). Here, the crux of the defendant's first ripeness argument consists in the notion that the plaintiffs must have proceeded in their cleanup effort only in accordance with an EPA authorized plan. The defendant has repositioned the EPA approval issue from 12(b)(6) to 12(b)(1).

Repositioning of the issue, however, does not change the result. This court has held that the plaintiffs need not have secured EPA authorization of actions undertaken prior to October 17, 1986, but that they were required to obtain authorization of remedial actions undertaken on or after the October date. Accordingly, as to the defendant's case or controversy argument, this court holds that the plaintiffs' claims for pre-SARA costs or for costs incurred in the performance of authorized remedial actions undertaken after October 16, 1986, are ripe. To the extent to which the plaintiffs have not pled that the EPA authorized the remedial actions which they undertook after October 16, they simply have not stated a claim for recovery of the costs incurred in performance of those actions.

The defendant's second ripeness argument focuses upon an alleged on-going administrative process. As noted, the ripeness doctrine protects administrative agencies from judicial interference until an administrative decision is final. This aspect of the ripeness doctrine operates in those cases involving a review of an administrative decision. *See e.g., Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The defendant Armitage argues that the court in this cost recovery action will be reviewing the EPA's ROD and that the ROD is not yet a final decision of the Agency. To support its contention that the EPA's decision is not final, the defendant points to the pending status of the plaintiffs' motion before the EPA for reconsideration of the ROD and to a September 4, 1987, Letter from Robert B. Schaefer, Regional Counsel of the USEPA, stating that "[n]o final decision has been made by the Agency on the specific issue of whether the plaintiffs' cleanup was consistent with the NCP." Attachment to Ar-

---

*Chicago Transit Authority*, 537 F.2d 943, 949 (7th Cir.1976).

This court declines to refer the necessity and consistency issue to the EPA. As the *Pinole Point* court noted, "[c]ourts are clearly capable of assessing a private party's remedial action to determine consistency with agency guidelines just as courts review agency action to determine

compliance with statutes or regulations." *Pinole Point Properties v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 290 n. 4 (N.D.Ca.1984).

**10.** The defendants cite Section 113(h)(4) in support of their position. The defendants' argument is confusing because Section 113(h)(4) applies to citizens' suits. 42 U.S.C. §§ 9613(h)(4).

mitage's Supplemental Letter of September 28, 1987.

On a motion to dismiss for lack of jurisdiction, a court may consider by affidavit facts which do not appear on the face of the complaint. *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947). The evidence which the defendant submits to support its contention that the ROD is not final is relevant to the jurisdictional issue only if the present case involves a review of the Agency's decision. This court has already held that the plaintiffs' claims do not constitute challenges to, nor involve review of, the EPA's ROD. To this extent, the court will not be interfering with an administrative process. The evidence that the ROD is not a final agency decision is irrelevant.

The court perceives, nevertheless, that the new authorization requirement of Section 122(e)(6) might require a court to refrain from adjudicating Section 107 claims if the EPA's authorization decision is not final. In the present case, the court finds no such on-going authorization process. As noted earlier, the plaintiffs have not, with one exception, alleged that the EPA approved any remedial actions which the plaintiffs undertook after October 16, 1986. Where no authorization has been alleged, no claim has been stated, and the unsettled nature of any approval decision is not in issue.[11] As to the consent order, which this court held could constitute the required authorization, there is no on-going administrative process. The parties have submitted for the court's consideration the consent order and the subsequent covenant not to sue. The covenant contains the federal and state EPA promises not to prosecute the plaintiffs for the performance or non-performance of the groundwater clean up. This court finds that, by virtue of the covenant not to sue, the EPA's approval of the groundwater clean up is final.

JOINT AND SEVERAL LIABILITY, CONTRIBUTION, AND UNCLEAN HANDS

■ The defendants, Gordon Bartels Company and Whittaker Corporation, move for judgment on the pleadings seeking dismissal of Count I of the Amended Complaint. The defendants request that this court rule as a matter of law that the plaintiffs may not obtain a judgment jointly and severally against the defendants. For the following reasons the court holds that such a determination cannot be made as a matter of law prior to the resolution of certain factual issues.

The scope of liability in Section 107 suits has been the subject of much discussion. *See e.g.*, Dubuc and Evans, *Recent Developments under CERCLA: Toward a More Equitable Distribution of Liability*, 17 ELR 10197 (June 1987); Comment: *Successor Landowner Suits for the Recovery of Hazardous Waste Cleanup Costs*, 33 UCLA L.Rev. 1737 (1986); Note: *Developments in Toxic Tort Litigation*, 99 Harv. L.Rev. 1458 (1986). The issue has arisen primarily in suits brought by the federal or state governments. In these government-initiated cases, the majority of courts have followed the rule of joint and several liability laid down in the seminal case of *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983).

In *Chem–Dyne*, the court examined the legislative history of CERCLA and concluded that Congress deleted from the Act "the term joint and several liability . . . to avoid a mandatory legislative standard applicable to all situations which might produce inequitable results in some cases." *Id.* at 808. With the support of legislative history, the *Chem–Dyne* court adopted the Second Restatement of Torts approach to the problem of liability. Under the Second Restatement, the court must make the factual determination of whether the harm caused is divisible or indivisible. If the harm is divisible or reasonably subject to division, the burden of proof as to apportionment is upon the defendants. If, however, the harm is indivisible each defendant is subject to joint liability as well as to several;

---

**11.** The defendant Armitage contends that the plaintiffs are now seeking the required EPA approval for landfilling the remaining core materials. Since the plaintiffs have not alleged that they have secured the approval, they have stated no claim for recovery of costs which might be incurred in landfilling; ripeness is not yet in issue.

that is, each defendant is liabile for the entire harm. *Id.* at 810.

Many courts have embraced the *Chem–Dyne* approach. *See e.g., State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1042 n. 13 (2nd Cir.1985); *United States v. Dickerson,* 640 F.Supp. 448, 450 (D.Md. 1986); *State of Colorado v. Asarco, Inc.,* 608 F.Supp. 1484, 1489–90 (D.Colo.1985). There is some indication that Congress, too, has blessed the rule enunciated in *Chem–Dyne.* Though the amendments under SARA are silent on the scope of liability under Section 107, the House did comment on the issue. In its report the House stated that it

> "fully subscribes to the reasoning of the court in the seminal case of *United States v. Chem–Dyne Corporation,* 572 F.Supp. 802 (S.D.Ohio 1983), which established a uniform federal rule allowing for joint and several liability in appropriate CERCLA cases." As that court held: A reading of the entire legislative history in context reveals that the scope of liability and term joint and several liability were deleted to avoid a mandatory legislative standard applicable in all situations which might produce inequitable results in some cases. (Citations omitted). The deletion was not intended as a rejection of joint and several liability. (citations omitted). Rather, the term was omitted in order to have the scope of liability determined under common law principles where a court performing a case by case evaluation of the complex factual scenarios associated with multiple generator waste sites will assess the propriety of applying joint and several liability on an individual basis. (*U.S. v. ChemDyne, supra* at 808.)
>
> [W]hen two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he had himself caused. But when two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm....

1986 U.S.Code Cong. & Ad.News, 2835, 2856.

Despite wide-spread acceptance of the *Chem–Dyne* approach, one court has ruled that the case does not go far enough. In *United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249 (S.D.Ill.1984), Judge Foreman of the district court for the Southern District of Illinois characterized the *Chem–Dyne* rule as "an excellent starting point." *Id.* at 1255. According to Judge Foreman, however, courts should not apply the rule rigidly. *Id.* at 1256. Rather, the unique character of cases arising under CERCLA call for a moderate approach to the problem of liability.

The moderate approach involves employing the *Chem–Dyne*–Restatement rule as a general rule susceptible to exceptions. Under the moderate approach, if the court finds that the injury is indivisible, the court has the discretion to hold the defendants jointly and severally liable. The court may, on the other hand, reject joint and several liability, regardless of the indivisibility of the harm, where the peculiar facts of the case point to a more fair apportionment of liability.

The factors which might persuade a court to reject joint and several liability where the harm is indivisible are such considerations as

> (1) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;
>
> (ii) The amount of the hazardous waste involved;
>
> (iii) the degree of toxicity of the hazardous waste involved;
>
> (iv) The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
>
> (v) The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
>
> (vi) the degree of cooperation by the parties with Federal, State or local officials

to prevent any harm to the public health or the environment.

*A & F Materials*, 578 F.Supp. at 1256.

These criteria are known as the "Gore Factors". Prior to the enactment of CERCLA in 1980, the House passed the Gore Amendment, which sought to modify the Restatement approach to joint and several liability. The Gore Amendment authorized the courts to reject a strict application of the Restatement rule where fairness dictates. *Id.*, citing 126 Cong.Rec. at H9461. As the *A & F* court noted, the House was concerned with the inequity of holding a small contributor liable for the whole injury merely because the contributor cannot prove his contribution. *A & F*, 578 F.Supp. at 1256.

The Senate did not adopt the Gore Amendment. Despite this, the *A & F* court concluded that the House's moderate approach is consistent with the intent of Congress under CERCLA. The court noted Senator Randolph's admonition that the deletion of any reference to joint and several liability in the Senate version did not "reflect a rejection of the standards in the earlier [House] bill." 126 Cong.Rec. at § 14964, as quoted in *A & F*, 578 F.Supp. at 1256. The court also noted that several representatives expressed their belief that the final compromise bill "implicitly incorporated the essence of the House's moderate approach to liability." *Id.* at 1257, citing 126 Cong.Rec. at H11,796 and H11,801.

It may be that the 1986 Congress rejected the moderate approach when it subscribed to the reasoning of the *Chem–Dyne* decision. This court does not believe so. In addition to setting forth the Restatement rule adopted in *Chem–Dyne*, the House also quoted from that portion of the *Chem–Dyne* decision which advocated a " 'case by case evaluation of the complex factual scenarios associated with multiple-generated waste sites.' " 1986 U.S.Code Cong. & Ad.News 2835, 2856 (quoting *U.S. v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808–10 (S.D.Ohio 1983)). At best, the House report is ambiguous as to the propriety of judicial application of the multiple factor analysis of the moderate approach.

*A & F* and *Chem–Dyne* set the stage for the particular issue facing this court. As noted earlier, these cases involve the scope of liability as between the government and responsible parties. In the present case, the government is not a party; the Section 107 claims have been brought by responsible parties against their fellow PRP's. In only one reported case has a court addressed the scope of liability issue where the main claim is one between responsible parties. In *Sand Springs Home v. Interplastic Corp.*, 670 F.Supp. 913 (N.D.Okl. 1987), the court held that responsible parties are jointly and severally liable to their fellow wrongdoers. *Id.* at 915–16. The court cited with approval *Chem–Dyne* and its progeny for the general proposition that where there is indivisible injury, liability is joint and several. The court did not offer any reason why the rule in *Chem–Dyne* is applicable to claims between PRP's.

Beyond *Sands*, the only cases discussing the scope of liability as between PRP's are those where the claims arise in third-party actions. The seminal case in this context is *United States v. Conservation Chemical Co.*, 619 F.Supp. 162 (D.C.Mo.1985). There, the United States brought a cost recovery action against several responsible parties. The defendants, in turn, asserted a third-party claim against responsible parties not originally joined in the suit. The defendants/third-party plaintiffs sought from the court a declaration as a matter of law that, should the harm be indivisible, the third-party defendants would be jointly and severally liable to the third-party plaintiffs. The court rejected the defendant/third-party plaintiffs' assertion. The court concluded that a PRP's claim against another PRP is in the nature of contribution. Contribution by its term implies several, and not joint and several, liability. *Conservation Chemical*, 619 F.Supp. at 229.

The defendants in the present case rely upon the *Conservation Chemical* decision to support their contention that all cost recovery claims between PRP's are essentially contribution claims, and are, thus, claims for several liability only. The de-

fendants' argument fails for several reasons.

The necessary premise of the defendants' argument is that contribution, and its attendant standard of several liability, is the only form of claim available for a responsible party suing another responsible party under Section 107. CERCLA now explicitly provides, however, that "[a]ny person *may* seek contribution" during or after a cost recovery action under Section 107(a). 42 U.S.C. §§ 9613(f)(1) (emphasis supplied). The statute is clearly permissive. In allowing but not mandating that claims under Section 107 be for contribution, the statute implies that Section 107 actions are not always in the nature of contribution. It is significant that Section 113(f)(1) does not specify that it applies only to certain types of claimants. Instead, by its terms it applies to "any person".

Policies underlying CERCLA support the notion that claims between PRP's are not always, and should not always be, in the nature of contribution. As noted earlier, CERCLA seeks the expeditious and safe clean up of hazardous waste sites. A blanket prohibition against joint and several liability in claims between responsible parties would discourage a willing PRP from cleaning up on its own. This is especially true where one or more of the parties are insolvent and, thus, incapable of sharing the costs of cleanup. In this situation, a PRP which is otherwise amenable to cleaning up may be discouraged from doing so if it knows that, where the harm is indivisible, its only recourse for reimbursement is contribution from the solvent PRP's. A prohibition against joint and several liability would leave the willing PRP holding the bag for the insolvent companies. On the other hand, a willing PRP would be encouraged to clean up where the law leaves open the possibility that the PRP could recover all costs as against nonwilling, solvent PRP's under a theory of joint and several liability.

The appropriate approach to the problem of liability in cases such as the present one is that taken by the *A & F* court.[12] Applying *A & F* to the present case, the analysis and burdens would be as follows. First, the defendants would have the burden of establishing that the harm is divisible. To carry their burden, the defendants would have to prove their contribution. If they were successful, their liability would be several. If, however, the court determines that the harm is indivisible, then the court would have the option to impose or not to impose joint and several liability. The court's decision on this matter would rest upon its consideration of the *A & F*/Gore factors. The court would consider the factors enunciated in *A & F* in relation to all PRP's in the case, whether plaintiff or defendant.

This moderate approach would not be at odds with the result in *Conservation Chemical.* In that case, joint and several liability was deemed inappropriate. There, the defendants/third-party plaintiffs were responsible parties who did not participate in the cleanup. Under the moderate approach, one of the factors which a court would consider is a responsible party's efforts to prevent any harm to the public or environment. Accordingly, in their third-party suit against the remaining PRP's the defendants/third-party plaintiffs in *Conservation Chemical* would not, perhaps, under the moderate approach be entitled to the benefits of joint and several liability.

The court adopts the moderate approach to the problem of the scope of liability. Accordingly, it reserves until such time as all factors are fully fleshed out its ruling as to the propriety of imposing against the defendants joint and several liability.

■ Several defendants have moved also for dismissal of the plaintiffs' Count II claim for contribution. As this court has already noted, Section 113(f)(1) allows claims for contribution between PRP's. Section 113(f)(1) provides:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this

12. In employing the moderate approach in the present case, this court makes no ruling as to the propriety of the approach in cost recovery claims involving the government as plaintiff.

title, during or following any civil action under Section 9606 of this title or under Section 9067(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under Section 9606 or Section 9607 of this title.

42 U.S.C. §§ 9613(f)(1).

Without deciding the extent to which SARA Section 113(f)(1) allows actions for contribution in the absence of a Section 107 claim, the court will allow the plaintiffs' Count II contribution claim since it was brought "during ... [this] civil action under ... Section 9607(a)" 42 U.S.C. § 9613(f)(1). This court has already held that the complaint states a claim under Section 107.

■ Finally, the defendants have moved for dismissal of the amended complaint under the doctrine of unclean hands. The defendants assert that the status of the plaintiffs as wrongdoers precludes them from seeking cost recovery.

The doctrine of unclean hands developed from the long-honored notion that he who seeks equity must do equity. *Dr. Franklin Perkins School v. Freeman*, 741 F.2d 1503, 1517 (7th Cir.1984). Only one court has held that the doctrine applies in cases brought under Section 107(a) of CERCLA. *See, Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Arizona 1984). Citing *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.*, 579 F.Supp. 823 (W.D.Missouri, 1983), the *Mardan* court ruled that "actions based upon Section 107 are actually equitable actions in the nature of restitution." *Mardan*, 600 F.Supp. at 1057–58. Being claims in equity, the court reasoned, the equitable doctrine of unclean hands must apply. *Id.*

The ruling in *Mardan* goes too far. It is true that claims under Section 107(a) of CERCLA are in the nature of restitution and, therefore, call upon the equitable powers of the court "to apportion responsibility in a fair and equitable manner." *United States v. Conservation Chemical Co., et al.*, 628 F.Supp. 391 (W.D.Missouri 1985). Notwithstanding the equitable nature of Section 107 claims, the language of the section clearly creates a right of cost recovery in "any person", including those who themselves are responsible parties under the Act. *Id.* at 404; *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 291 (N.D.Cal.1984); *City of Philadelphia v. Stephan Chemical Co.*, 544 F.Supp. 1135, 1143 (E.D.Pa.1982). This expressed intent of Congress to allow wrongdoers to recover against their compatriots overrides any common law rules to the contrary.

Additionally, application of the doctrine of unclean hands would defeat the policies underlying CERCLA. As noted earlier, CERCLA seeks to encourage expeditious and safe clean up of hazardous waste sites. In barring a responsible party from recovering costs incurred, the courts would encourage willing PRP's to postpone cleaning up until all PRP's agreed to participate fully. For these reasons, the court rejects application of the unclean hands doctrine to Section 107 cost recovery suits.

CONCLUSION

For the reasons stated above, the court denies the motions to dismiss the complaint for failure to state a claim, denies the motion for summary judgment, and denies the motion to dismiss the case for lack of jurisdiction. The court denies in part the motion for partial judgment on the pleadings and reserves for later determination that part of the motion relevant to the definition of "remedial action".

In summary, the court makes the following rulings:

1. The plaintiffs state a claim for recovery of costs incurred in the performance of all response actions undertaken prior to October 17, 1986, and for recovery of costs incurred in relation to those remedial ac-

tions undertaken on or after October 17, 1986 contemplated by the September, 1986 consent order;

2. The claims are ripe for review;

3. The scope of liability will be determined upon consideration of the specific and unique facts of this case;

4. The plaintiffs state a claim in Count II of the amended complaint for contribution; and

5. The doctrine of unclean hands is inapplicable to this Section 107 cost recovery suit.