**UNITED STATES of America,
Plaintiff,**

v.

**DRUM SERVICE CO. OF FLORIDA, John Michael Murphy, Douglass Fertilizer & Chemical, Inc., Spencer G. Douglas, Mallory Corporation, Joseph P. Brooks, and Malory F. Presley and Richard A. Feinberg, personal representatives of the Estate of Irving Feinberg, Defendants.**

No. 6:98–CV–687–ORL–28C.

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 3, 1999.

Anita M. Cream, Roberto H. Rodriguez, Jr., U.S. Atty's Office Middle District of Florida, Orlando, FL, Karl J. Fingerhood, U.S. Dept. of Justice Environmental Enforcement, Washington, DC, Patricia I. Hurst, U.S. Dept. of Justice Environment & Natural Resources Div., Washington, DC, Lois J. Schiffer, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Division, Washington, DC, Rudolph C. Tanasijevich, Office of CERCLA Legal Support Environmental Accountability Division, Atlanta, GA, for U.S.

Roger Dean Schwenke, Charles J. CacciabeveCarlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Anthony R. Picarello, Covington & Burling, Washington, DC, for Drum Service Co. of Florida, John Michael Murphy.

William Leonard Pence,Peter L. Pollock, Jr., Geoffrey B. DiMauro, Timothy A. Smith, Akerman, Senterfitt & Edison, P.A., Orlando, FL, for Douglass Fertilizer and Chemical, Inc., Spencer G. Douglass.

Chris Nick Kolos, Thomas M. Burke, Holland & Knight, LLP, Orlando, FL, for Mallory Corp., Joseph P. Brooks, Malory F. Presley, Richard A. Feinberg.

## ORDER

GLAZEBROOK, United States Magistrate Judge.

This cause came on for hearing on March 2, 2000 on the following motion:

| MOTION: | DEFENDANTS DRUM SERVICE'S AND MURPHY'S MOTION FOR SUMMARY JUDGMENT [Docket No. 96] |
|---|---|
| FILED: | November 3, 1999 |
| DISPOSITION: | DENIED. |

## I. *BACKGROUND AND PERTINENT FACTS*

Defendant Drum Service Co. of Florida conducts a steel drum reconditioning business on a portion of what has come to be known as the Zellwood Groundwater Contamination Superfund Site [the "Site"]. Docket No. 102 at Exhibit 5–B, response 4. The Site consists of fifty-seven acres located near the unincorporated township of Zellwood, Florida. Docket No. 97 at 2. Drum Service commenced its steel drum reconditioning operations at the Site in 1963. Docket No. 102 at Exhibit 4–B, response 6. At some time during the 1970s, Drum Service used an approximately twenty acre parcel at the Site that was owned by the predecessor of Napa Properties to store some of Drum Service's inventory of used drums. Docket No. 102 at Exhibit 4–B, responses 24 and 25. Defendant Murphy served as Drum Services' general manager between 1966 and 1971, and its Vice President between 1971 and 1977. Docket No. 102 at Exhibit 5–B, responses 6 and 8. Murphy bought Drum Service in February 1977. Docket No. 102 at Exhibit 5–B, response 10.

On December 11, 1980, the Comprehensive Environmental Response, Compensation and Liability Act [42 U.S.C. § 9601 *et. seq.,* "CERCLA"] went into effect. 42 U.S.C. § 9652(a). On July 31, 1981, a representative of the United States Environmental Protection Agency signed a "Potential Hazardous Waste Site Identification" form for a site identified as "Drum Service of FL, 803 Jones Ave., Zellwood, FL 32798." Docket No. 96 at Exhibit B. The form further stated:

> There is possible contamination of groundwater due to the percolation ponds. Analytical results (extraction procedure) show the following metal levels:

|     |       |     |
| --- | ----- | --- |
| Cr  | 1.105 | ppm |
| Pb  | 0.49  | ppm |
| Hg  | 4.6   | ppb |

FL–DER is currently undertaking a groundwater survey and wells are sampled once every 6 months.

A report of the State of Florida Department of Environmental Regulation dated August 6, 1981 concluded that "[t]he surface impoundments of Drum Service Company of Florida and Southern Liquid Fertilizers, Inc. have created a plume of contaminated ground water within the surficial aquifer." Docket No. 102 at Exhibit 2, Bates No. ZWD–000007. The report recommended construction of monitoring wells and removal of the ponds and contaminated sediments. Docket No. 102 at Exhibit 2, Bates No. ZWD–000007.

On December 8, 1982, while surveying the Site, EPA representatives discovered a large area of abandoned drums and piles of sludge on the twenty-acre parcel owned by Napa Properties [the "Abandoned Drum Site"]. Docket No. 102 at Exhibit 3, Bates No. ZWD–000081. During August 1983, employees of Drum Service conducted an emergency removal of more than 3,000 abandoned drums on behalf of Napa Properties. Docket No. 102 at Exhibits 8 and 9. On September 8, 1983, the Site was listed on the first National Priorities List. Docket No. 102 at Exhibit 4–B, response 39. During 1985, EPA contractor NUS Corporation conducted a Remedial Investigation of the Site. Docket No. 101 at Exhibit 10, Bates No. ZWD–000872. In April 1986, NUS Corporation submitted a draft feasibility study. Docket No. 102 at Exhibit 11.

On December 17, 1987, the EPA issued a Record of Decision ["RoD"] regarding the Site that addressed both soil and groundwater contamination. Docket No. 96 at Exhibit K. The RoD summarized as follows the remedial action chosen:

- Excavation of soils/sediments in the three on-site ditches, the existing abandoned drum area ponds, the temporary sludge storage area, the two former percolation [*sic*]ponds, and the waste piles;
- On-site thermal destruction of the excavated soil/sediment;

- Appropriate leach testing and disposal of the incinerated soil;
- Groundwater removal and treatment for the shallow aquifers. ARARs will be used as clean-up and treatment criteria.
- Flushing the treated groundwater back through the abandoned drum area, to clean up the residual contamination
- An attempt will be made to locate and plug up any abandoned wells or bore-holes in the area;
- A long-term monitor program for the private potable water wells in the area.

Docket 96 at Exhibit K. On March 1, 1990, the EPA issued an Amended Record of Decision that was limited in scope to soil contamination at the Site (referred to as "Operable Unit 1").[1] Docket No. 96 at Exhibit D. The Amended RoD described the following changes from the 1987 RoD:

Further Characterization and Results from Treatability Study Information (Weston, 1989) developed by U.S. EPA during the Superfund Remedial Design Process demonstrates that the selected remedy described above satisfies EPA'S goals for source control. This change in method of source control is significantly different than the previous ROD, 1987. The ROD, 1987 had determined incineration of soil followed by solidification of ash to be the proper source control method. Solidification has been proven to be a viable, effective treatment for soils and sludges at the Zellwood site at a lower cost.

Specifically, the fundamental change in the previous remedy (ROD, 1987) and the new selected remedy, described herein, is as follows: First, solidification of contaminated soil and sludges at the locations described herein will increase soil volume in the constructed remedy. This is because incineration would reduce volume prior to solidification of ash. Second, solidification is a different type of treatment criteria. Third, the cost of the selected remedy is substantially less than incineration and would therefore effectuate a quicker, cost effective treatment. This fundamental change will produce an effective solution to contaminants present at the site without removal of hazardous constituents off site. Further, the fundamental change meets Applicable and Relevant and Appropriate Requirements at a lower cost.

Docket No. 96 at Exhibit D, pages 2—3. The Amended RoD estimated the cost of this remedy as $780,000 in capital expenses, with an additional $250,000 for twelve years of operation and maintenance. Docket No. 96 at Exhibit D, page 3.

By letter dated March 14, 1990, the EPA notified Drum Service and Murphy that they were potentially responsible parties under CERCLA, demanded reimbursement of $2,161,178.18 previously expended by EPA, and required submission of a "good faith offer" regarding future remediation costs. Docket No. 102 at Exhibit 14. By letter dated April 10, 1990, Drum Service and Murphy responded that they could not (as required by the EPA's good faith offer rules) represent that they were financially able to undertake EPA's selected remedial action. Docket No. 102 at Exhibit 15, page 2. The letter presented Drum Service's and Murphy's suggested changes to the proposed remedial action, which including capping EPA's oversight costs at $25,000. By letter dated July 11, 1990, the EPA responded that it did not consider Drum Service's and Murphy's letter to be a good faith offer and that it would proceed to issue a Unilateral Administrative Order pursuant to § 106 of CERCLA. Docket No. 102 at Exhibit 16.

On July 10, 1990, the EPA issued a lengthy Unilateral Administrative Order addressed to Drum Service, Murphy and seven other parties. Docket No. 102 at Exhibit 17. The Unilateral Administrative

---

1. The EPA issued a Record of Decision with respect to groundwater contamination at the Site ("Operable Unit 2") on August 24, 1995. Docket No. 102 at Exhibit 13.

Order required (among other things) the completion of five main tasks: 1.) scoping; 2.) remedial design; 3.) remedial action; 4.) operation and maintenance; and 5.) monitoring. Docket No. 102 at Exhibit 17, page 23. By letter dated August 13, 1990, Drum Service and Murphy notified EPA of their intention not to comply with the Unilateral Administrative Order, again stating that they could not represent that they were financially able to pay the full cost of the remedial work ($1.03 million). Docket No. 102 at Exhibit 18.

In December 1991, EPA's contractor, Tetra Tech, Inc., issued a Request for Proposal ["RFP"] for excavation of the contaminated soils at the Site. Docket No. 96 at Exhibit R. The RFP divided the Site into eight separate excavation areas and solicited competitive bids from qualified contractors on the following remedial activities:

- Clearing of all excavation areas, stockpile area, decontamination pad and trailer areas, and construction access toad areas;
- Installation of office trailer and required utilities;
- Construction of construction access toads;
- Construction of a decontamination pad and required utilities and systems;
- Installation of sediment and erosion control measures;
- Area preparation, excavation and transport of contaminated soils and/or sediments to stockpile area (base volume);
- Assist engineer in obtaining and handling samples of soils and other materials for laboratory analysis;
- Excavation of additional volumes of contaminated soils identified by confirmatory sampling and analysis, and transport of these soils to stockpile area;
- Removal, disposal and replacement of asphalt L concrete paving;
- Backfill and restoration of disturbed areas;

- Construction of a contaminated soil stockpile;
- Clean-up and closing of all areas at end of work;
- Removal and proper disposal of all wastes generated during the work;
- Removal of office trailer, temporary facilities, etc.

All work shall be performed in accordance with all existing laws and regulations of the United States, State, County and local government agencies. All agencies have been contacted during the design phase of this project and a report summarizing the findings is included as Appendix C.

Docket No. 96 at Exhibit R, Division 5, page 01010-4—5. The deadline for bids was January 8, 1992.

In a letter dated January 7, 1992, Drum Service and Murphy criticized the RFP as "gold plated." Docket No. 96 at Exhibit S. The letter further stated that despite its "over-engineering," the RFP had, for the first time, clearly spelled out specific, discreet remediation activities and goals:

However, the details set out in the Request for Proposal now demonstrate that the tasks contemplated by Operable Unit 1 include three distinct activities, identified in the RFP as Activities 1, 2 and 3. The RFP identifies the second and third activities, but by its terms relates only to what is identified as Activity 1, the excavation of soils and/or sediments, found at designated and specified locations. Therefore, now (for the first time), EPA has identified and very clearly described specific discreet activities. By contrast to the § 106 Order and its vague descriptions of work, the RFP and the attachments to it provide great detail on the anticipated location of excavation areas and the delineation of the anticipated cubic yardage to be extracted from those locations.

In 1990 meetings with EPA, EPA acknowledged that at the time of the 1988 Roy Weston TAT data analysis, the

original quadrants contemplated for excavation were never surveyed. Between the time of that 1988 Weston TAT work, the discussions with Ms. Danner in 1990, and the more recent discussions with the RPM and delineation in the RFP, the 65 foot square area proposed for excavation on Drum Service Company property (former percolation pond # 2) has moved three times. However, now, through the RFP and the detailed survey and schedules attached to it, all of the required details and elements for this excavation project have been set out, so **Drum Service intends to undertake and to perform those activities, beginning January 13.** Now that more detailed analysis has been performed, and is reflected in the RFP, Drum Service has determined that it is feasible to undertake activities consistent with the results intended by Activity One, including verification.

Docket No. 96 at Exhibit S, pages 3–4 (emphasis supplied).

On or about Friday, January 10, 1992, employees of, and/or contractors retained by, Drum Service began excavation at the Site. Docket No. 97 at 6. They excavated an undisclosed amount of contaminated soil from Area 3 of the Site (also known as the "Middle Ditch") and stockpiled it in the Abandoned Drum Area (Area 1). Docket No. 102 at Exhibit 19, page 19. On Tuesday, January 14, 1992, EPA's Remedial Project Manager visited the Site and ordered Drum Service to cease its ongoing excavation activities. Docket No. 97 at page 7. By letter dated January 16, 1992, the EPA notified Drum Service and Murphy that it "considers Mr. Murphy's recent excavation to be in direct conflict with [CERCLA]" and promised to "use all administrative and judicial avenues to prevent Mr. Murphy from performing any additional response action at the Site that is not approved by EPA." Docket No. 102 at Exhibit 25. By Unilateral Administrative Order dated January 29, 1992, the EPA ordered Drum Service and Murphy

to "cease and desist all excavation of contaminated soils and any other cleanup or other activities which disturb in any way the contamination on the Site . . . ." Docket No. 102 at Exhibit 26, page 7.

On June 18, 1992, EPA-authorized subcontractors began excavation of contaminated soils at the Site. Docket No. 102 at Exhibit 20, page 10. Five years, eleven months and twenty-five days later, on June 12, 1998, the United States filed the present action seeking a judgment against Drum Service, Murphy and six other defendants pursuant to § 107 of CERCLA for all response costs previously incurred by the EPA, and a declaratory judgment under § 113(g)(2) of CERLCA of the liability of the defendants for further response costs. Docket No. 1.

## II. *THE LAW*

### A. *Standard of Review on Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jeffery v. Sarasota White Sox,* 64 F.3d 590, 593–94 (11th Cir.1995); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by showing the Court that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party

has discharged its burden, the non-moving party must then "go ·beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989); *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> in deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery v. Sarasota White Sox,* 64 F.3d 590, 594 (11th Cir.1995), quoting *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liber-* ty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. On a summary judgment motion the Court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1531 (11th Cir.1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Id.*

### B. *Material Submitted in Opposition to Summary Judgment*

Federal Rule of Civil Procedure 56(c) provides that the party making a motion for summary judgment may submit affidavits to support its argument as to the absence of a genuine issue of material fact. Rule 56(e) provides as follows regarding the materials that the non-movant must submit in response:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the adverse party.

The non-movant must adduce significant probative evidence that would be sufficient for a jury to find for the non-movant. *LaChance v. Duffy's Draft House,* 146 F.3d 832, 834 (11th Cir.1998), *citing Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505. A reviewing court generally cannot consider inadmissible hearsay evidence in opposition to a summary judgment motion. *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999). In considering a motion for summary judgment, a reviewing court must consider all the proffered evidence and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition. *Kennett–Murray Corporation v. Bone,* 622 F.2d 887, 893 (5th Cir.1980). However, when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony. *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.,* 736 F.2d 656, 657 (11th Cir.1984).

### C. *Statute of Limitations Under CERCLA*

Section 107(a) of CERCLA provides that certain enumerated parties, including the owner of a vessel or facility, are liable for

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a). Section 113 governs judicial review and enforcement of CERCLA through civil proceedings. Section 113(b) vests the federal courts with exclusive jurisdiction over controversies arising under CERCLA. Section 113(g) specifies the time within which civil actions may be brought. Section 113(g)(2) states as follows:

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced -

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after **initiation of physical on-site construction of the remedial action,** except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title

for recovery of costs at any time after such costs have been incurred.

42 U.S.C. § 9611(g)(2) (emphasis supplied).

In order to determine the proper statute of limitations for a CERCLA cleanup, the cleanup first must be defined as either a removal or remedial action. *Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035, 1041 (S.D.Ga.1994). Section 101(23) defines "removal" as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.).

42 U.S.C. § 9601(23). Section 101(23) defines "remedial action" as:

> those actions **consistent with permanent remedy** taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24) (emphasis added).

At least two courts have considered (and in both cases, rejected) the argument that "remedial action" can never occur before the EPA issues final written approval of the remedial design. *See U.S. v. Navistar Intern. Transp. Corp.,* 152 F.3d 702, 712 (7th Cir.1998); *State of California on Behalf of California Dept. of Toxic Substances Control v. Hyampom Lumber Co.,* 903 F.Supp. 1389, 1392 (E.D.Cal.1995); *but see, Advanced Micro Devices, Inc. v. National Semiconductor Corp.,* 38 F.Supp.2d 802, 813 (N.D.Cal.1999) (acknowledging that "[u]nder *Hyampom* and *Navistar,* the formal adoption of the final remedy is not a 'bright-line' cut-off between 'removal' and 'remedial action,'" but holding that remedial action could not occur until the remedial design "was known, and until the

RI/FS assessment process had reported sufficient information to allow for design of the remedy.") In *Navistar*, the United States had argued, as it does here [Docket No. 101 at 9], that the phrase "the remedial action" in § 113(g)(2)(B) (with particular emphasis on "the") is a term of art that modifies, if not supercedes, the lengthy definition provided in § 101(24). *Navistar*, 152 F.3d at 711. Specifically, the United States had argued that only the permanent remedy chosen by the EPA qualified as "the remedial action." The *Navistar* court disagreed, concluding that:

> If it had intended to require that the EPA issue its final approval of the remedial design in order for a "remedial action" to begin within the meaning of § 9613(g)(2)(B)—a contention unsupported by the definition of "remedial action"—Congress surely would have provided us with a more explicit direction to that effect.

*Navistar*, 152 F.3d at 712.

### D. *Section 122(e)(6)*

The filing of a reimbursement action in federal court under § 113 of CERLA is not the only avenue available to the United States to enforce CERCLA compliance by, or recoup response costs from, a potentially responsible party ["PRP"]. Section 122 grants the President (and by delegation, the EPA) authority to enter into settlements with PRPs, culminating in either a consent decree or an administrative order. Section 122(e)(6), which is captioned "Inconsistent Response Action," provides as follows:

> When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

42 U.S.C. § 9622(e)(6). Section 122(e)(6) was added as part of the Superfund Amendments and Reauthorization Act of 1986. Pub.L. 99–499, § 122. It was included in the Conference Committee's substitute in order to "clarify that no potentially responsible party may undertake any remedial action at a facility unless such remedial action has been authorized by the President." House Conference Committee Report No. 99–962 (October 3, 1986), 1986 U.S.Code Cong. & Ad. News 2835, 3347.

## III. *APPLICATION AND ANALYSIS*

In their memorandum in support of their motion for summary judgment [Docket No. 97], defendants Drum Service and Murphy argue that the present action is untimely under § 113(g)(2) as to both removal and remedial costs. Alternatively, Drum Service and Murphy argue that even if the present action is timely as to remedial costs, it is nevertheless time-barred as to removal costs. The Court considers these arguments in turn.

### A. *Remedial Costs*

Drum Service and Murphy argue that their excavation activities in January 1992 constitute "initiation of physical on-site construction of the remedial action" and that the United States therefore brought this suit six months too late. The United States advances two arguments for the proposition that the § 113(g)(2)(B) limitation period did not commence until June 18, 1992—a date which is, by five days, within the six-year period specified in § 113(g)(2)(B). First, it argues that the limitation period in § 113(g)(2)(B) cannot be triggered by actions undertaken by a PRP without EPA's authorization while EPA is performing the remedial action. Alternatively, it argues that even if unauthorized response actions could trigger the statute of limitations, the defendants' January 1992 excavations did not do so. Because the Court agrees with the first proposition, it does not reach the second.

### 1. *Actions Taken in Violation of § 122(e)(6) Cannot Trigger the § 113(g)(2)(B) Limitation Period*

■ Drum Service and Murphy devote a great deal of their memorandum in support of their motion for summary judgment [Docket No. 97] to arguing why the January 1992 excavations satisfy the four requirements specified in § 113(g)(2)(B): 1.) initiation of 2.) physical on-site 3.) construction[2] of 4.) the remedial action. By contrast, they devote only a single paragraph to arguing why an action that violates § 122(e)(6) can nevertheless commence the limitation period. Their argument is that, as a matter of definition, only "remedial action" can trigger § 122(e)(6), which prohibits PRPs from "undertak[ing] any remedial action at the facility unless such remedial action has been authorized by the President." Conversely, according to Drum Service and Murphy, any activity that violates § 122(e)(6) must, per force, be remedial action. They maintain that certain activities such as the January 1992 excavations simultaneously trigger both § 122(e)(6) and § 113(g)(2)(B) without any interplay between the two sections. They invite the Court to treat these two sections as completely unrelated. The Court declines to do so.

Taken to its logical extreme, this reading would deprive § 122(e)(6) of any adverse consequences merely because that subsection is silent as to adverse consequences. Even Drum Service and Murphy do not push their reading this far. Instead, at the March 2, 2000 hearing, they argued that a § 122(e)(6) violation does carry numerous "disincentives," including a potential $25,000 per day fine and the inability to recoup from other PRPs the costs of an action taken in violation of § 122(e)(6). However, they do not—and cannot—make any defensible argument on the text of CERCLA as to why § 122(e)(6) should be read in conjunction with CERCLA's civil penalty (§ 109[3]) and cost recovery (§ 107) provisions, but not its limitations provision (§ 113).

One lower court has held that § 122(e)(6) limits a PRP's recovery under § 107. *Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 691 F.Supp. 1100 (N.D.Ill. 1988). In reaching this conclusion, the *Acme Solvents* court stated that "[t]he title of Subsection (e)(6)—'Inconsistent Response Action'—implicates the consistency element of Section 107." *Acme Solvents,* 691 F.Supp. at 1109. This may be true, but the same argument can be made with respect to the term "remedial action," which is defined in relevant part as:

> those actions **consistent with permanent remedy** taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. . . .

42 U.S.C. § 9601(24) (emphasis supplied).

### 2. *A Genuine Issue of Material Fact Exists as to Whether the January 1992 Excavations Were "Authorized" Under § 122(e)(6)*

■ Drum Service and Murphy argue that the January 1992 excavations do not violate § 122(e)(6) because they were "authorized." In support of this proposition,

---

**2.** At the March 2, 2000 hearing, the United States stipulated that the January 1992 excavations constitute "construction" as that term is used in § 113(g)(2)(B).

**3.** The Court presumes that Drum Service's and Murphy's reference at the March 2, 2000 hearing to a "$25,000 dollar per day fine" was intended as a reference to the general civil penalty provision in CERCLA. 42 U.S.C. § 9609. Several other CERCLA provisions, including those regarding inspections (§ 104(e)(5)(B)), abatement actions (§ 106(b)) and state enforcement (§ 121(e)), also provide for such a penalty. Section 109 includes a list of CERCLA sections, the violation of which triggers § 109 penalties. Section 122(e)(6) is not included in the list.

they point to two documents: 1.) the Unilateral Administrative Order issued by EPA on July 10, 1990; and 2.) Drum Service and Murphy's January 7, 1992 letter. They invite to Court to find, as a matter of law, that these documents constitute authorization of the EPA (by delegation from the President) under § 122(e)(6). The Court declines to do so.

The cited documents are inconclusive. The July 10, 1990 Unilateral Administrative Order [Docket No. 102 at Exhibit 17] is a lengthy document that imposed many obligations on the respondents in addition to the obligation to excavate sediment at the Site. Many of these obligations, including the obligation to obtain EPA's approval of the supervising contractor (§ IX, para.C) and to submit a proposed remedial design to EPA (§ IX, para.C) seem clearly intended.as conditions precedent to physical excavation.

■ The January 7, 1992 letter [Docket No. 96 at Exhibit S] contains only a single sentence regarding Drum Service's and Murphy's intent to undertake remedial action, buried in a lengthy letter devoted mostly to recapitulating prior events and criticizing the very same request for proposal that Drum Service and Murphy allegedly used as a guide for the January 1992 excavations. Drum Service and Murphy cite to no record evidence reflecting whether (and if so, when) the letter was read by its addressee, Teresa H. Atkins, or that Ms. Atkins was the proper addressee for such a letter. Even if the letter was read and fully comprehended by the proper recipient at EPA on January 7, 1992, the Court cannot conclude as a matter of law that a one week delay (prior to the EPA representative's visit to the Site and verbal cease-and-desist order on January 14, 1992) estops the government from challenging that action.[4]

### B. *Removal Costs*

■ Drum Service and Murphy state in their memorandum in support of their motion for summary judgment that "'the completion of the removal action' was on March 1, 1990." Docket No. 97 at 19. Section 113(g)(2) states as follows:

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced -

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). Therefore, the removal action is timely if either of the following two events occurs within three years of completion of the removal action: 1.) initiation of the cost recovery action (which did not occur) or 2.) initiation of the remedial action (which, under either the United States' or the defendants' account, did occur). Accordingly, it is

**ORDERED** that defendant's motion for summary judgment filed November 3, 1999 [Docket No. 96] is **DENIED**.[5]

---

4. In fact, the estoppel argument of Drum Service and Murphy is weak. The *Acme Solvents* court stated that "[a]uthorization under Section 122(e)(6) cannot be proved by a showing of Agency passive acquiescence." *Acme Solvents*, 691 F.Supp. at 1110. In a different context, the Eleventh Circuit has held that a party asserting equitable estoppel against the federal government must prove some affirmative misconduct by the government, in addition to the traditional elements. *Tefel v. Reno*, 180 F.3d 1286, 1302—03 (11th Cir.1999).

5. Magistrate judges may deny motions for summary judgment by direct order, but may grant such motions only by report and recommendation. Local Rule 6.01(c)(18).